## NATIONAL LABOR RELATIONS BOARD v. CINCINNATI CHEMICAL WORKS, Inc.

### No. 9662.

Circuit Court of Appeals, Sixth Circuit.

July 17, 1944.

James Paradise, of New York City (Alvin J. Rockwell, Howard Lichtenstein, Owsley Vose, and Leslie J. Capek, all of Washington, D. C., on the brief), for petitioner.

James R. Clark, of Cincinnati, Ohio (Burton E. Robinson, of Cincinnati, Ohio, on the brief), for respondent.

Before HAMILTON, MARTIN, and Mc-ALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

Though the National Labor Relations Board found insufficient evidence to support the charge that the respondent, Cincinnati Chemical Works, Inc., dominated or assisted an independent labor Association organized by its employees, reversed the findings of Trial Examiners that Scherm, an active Association partisan, was a supervisory employee for whose conduct respondent was responsible, and held also that stationary engineers were not supervisory employees, the Board, nevertheless, upheld the Examiners' findings that respondent had engaged in unfair labor practices and entered its customary cease and desist order against discouragement of membership in a C. I. O. union. This ultimate finding was, in our judgment, against the overwhelming weight of the evidence.

A single witness, Bennett, who repudiated his own signed statement and otherwise acted a self-contradictory role, testified that he had overheard Barwig, a foreman at one of respondent's plants, say that men wearing Union buttons "wasn't going to get such a good break; that the ones that didn't have no buttons would get all the gravy;" so he "took off" his Union button.

Jenkins testified that Crane, an assistant chemist at another of respondent's plants, told him that if he joined the Union, Crane could make it hard on him. But the witness admitted that while a member of the Union, he was paid a Christmas bonus and received from respondent the same treatment "as the other fellows" did. Marshall, also an employee, testified that Chemist Crane expressed surprise that he was "mixed up with" the C. I. O. Union and asked him if he had a grudge against anybody. Marshall conceded, however, that all employees were "treated the same way" and that "each one had his own work to do, no matter what union be belonged to." Marshall stated further that in changing his membership from the Association to the Union, he had in mind the greater advantage enjoyed by the C. I. O. Union under the law. Asked by the Trial Examiner what law he had in mind, the witness replied, "Well, the Wagner Act, as far as that is concerned."

Our search of the record reveals no other pertinent evidence tending to support the charge that respondent sought to influence its employees' choice of affiliation. Evidence supporting a contrary inference is voluminous. As evincing its good faith, respondent called a meeting of all its numerous foremen and supervisory employees and through its two top executives instructed them to keep "hands off" between the Union and the Association, not to discuss or mention any issues between them or "to try to persuade or sway anybody" in either direction. It was made plain that the employees were "to have their own free will entirely."

Notices were posted by the company in its plants that there would be no discrimination against any employee because of his union or non-union affiliation. More than a dozen employees, namely Haubner, Eads, Burkley, Barge, Steele, Wethington, Ruess, Devore, O'Keefe, Oglesby, Jenkins, Marshall, Holmes and Norman, testified to the effect that they had been treated fairly by the respondent and had not been discriminated against because of their C. I. O. Union membership. A Christmas bonus and a periodic salary raise came to Union and non-Union men alike.

Our reading of the record in entirety has convinced us that the respondent sailed a fair and neutral course in the controversy in its plants between union and non-union labor, and we cannot concur in the Labor Board's illogical deductions. But the Circuit Courts of Appeals of the United States have been repeatedly admonished by the Supreme Court that they are not privileged under the Wagner Act to substitute their own reasoning upon evidentiary fact issues for that of the Labor Board. So, in duty bound, we reluctantly decree enforcement of the cease and desist order entered by the Labor Board.

But enforcement of the Board's order for reinstatement of Julius Price with back pay is a different matter.

We do not conceive that in enacting a law in time of peace for the furtherance of peaceful industrial relations, Congress intended to foreclose the courts of the United States in reviewing Labor Board decisions from functioning even independently enough to protect the nation from the danger of subversive activity in munition plants in time of war. When the passage of the Wagner Act, 29 U.S.C.A. § 151 et seq., was debated, its proponents placed much stress upon the check upon the power

of the Labor Board assured by court review. We cannot believe that Congress contemplated to set up the Labor Board so high above the federal courts that a United States Circuit Court of Appeals in time of war would be compelled to direct the reinstatement in a chemical plant of a discharged employee who, despite a contrary finding by the Board, is believed by this court upon the evidence of record to have stated on the day following Pearl Harbor that he hoped the Japs would sink some more United States ships. Roosevelt Smith and Sam Phelps, two of his co-workers of the same color, swore firmly that Price made that remark to them; and another, William Oglesby, testified that he heard Phelps ask Price why he would live in a country, the only country that he knew anything about, and be against it, and that Price replied that he had tried to join the Marines and had been barred by reason of his color. No hostile motivation against Price upon the part of these three witnesses was shown and the acceptance by the Board of Price's denial of his subversive remark as against the positive testimony of these disinterested witnesses seems unjustifiable.

Careful consideration of the entire evidence in the case has left no reasonable doubt in our minds that Price's discharge was not remotely related to his Union activity, but was occasioned, as stated by respondent's executive manager, E. B. Brunskill, by the fact that the company wanted nobody in its employ felt to be in any way disloyal to this country. In the circumstances of the case, this court denies the petition of the National Labor Relations Board for enforcement of its order directing the reinstatement of Julius Price with back pay.

McALLISTER, Circuit Judge (specially concurring).

There can be no question that one who makes a statement that he hopes an enemy of this country will sink the ships of our fighting forces should be instantly discharged from his job in a war manufacturing plant. It certainly would not be necessary to find out whether he meant what he said or merely gave utterance to such expression as a result of momentary, sudden anger and resentment; and it would make no difference whether an employer were looking for an opportunity to discharge such a man because of his union

activity. The statement, itself, would call for the most stringent action within the power of the employer. Not only would immediate discharge be justified, but the retention of the offending party in such a position would amount to culpable negligence, weakness, or even disloyalty.

On this phase of the case, we are confronted by two questions: (1) whether the finding of fact of the Board, that Julius Price did not make a disloyal statement, should be set aside on the ground that there is no evidence to sustain it; and (2) whether the finding that Price was discharged for union activity, should be likewise set aside. A brief review of the situation is required, to give the background necessary to a proper survey of the evidence.

For many years, a considerable number of Negro workers was employed by the Cincinnati Chemical Works. Prior to August, 1941, there was no labor organization of any kind in the plant, but, during that month, the United Mine Workers of America, District 50, affiliated with the C. I. O., commenced an organization drive. Price, a Negro, the employee here in question, became a member of the Union and assumed a prominent part in the work of soliciting membership among the plant employees. He was elected an officer and a member of the executive board of the Union, and was also named shop steward to represent the yard gang, which was composed, largely, of Negro workers. Moreover, he was a member of the Union committee which prepared a kind of newsletter, which was circulated among the workers. The dominating thought of Price was that Negroes did not have a fair opportunity in industry, and, incidentally, were discriminated against in the plant in question. He argued that the union of which he was a member did not so discriminate—contrary to the practices of many other unions. He felt that all workers, white and Negro, should co-operate in such a union, for better wages and working conditions for all; but the chief thought that pervaded his activity was discrimination against Negroes. In such a company as that of the respondent, the repeated expression of his views was bound to be displeasing and disturbing to the management. He solicited Negro workers to join his union without much success. For the most part, they joined the Association, which Price considered a company union.

It is claimed by the respondent, that on December 8, 1941, Price had a conversation with Roosevelt Smith, a Negro worker, in the presence of Sam Phelps, also a Negro worker. Smith testified that on that morning Price asked him if he had seen what Japan did to America, and that Price "said, 'She sink two ships for America and I hope it would sink some more.' * * * Sam ask him why would he speak a word like that when this is the onliest country he knowed of." Smith further testified:

"Q. Did Julius Price say anything in answer to that? A. Yes, sir.

"Q. What did he say? A. He says— why, he says he tried to join the Marines. He tried to join the Marines and he went over about three or four times, and he said he finally went, and the third day he went up there the man told him, he don't take any colored people in the Navy.

"Q. In the Navy or the Marines? A. In the Marines. * * *

"Q. Now, did anybody else come up during part of this conversation? A. Bill Oglesby. * * *

"Q. Did you hear any conversation at all between Oglesby and Price? * * * A. He said 'Why do you speak of a person like that?'

"Q. Who asked him that? A. Bill Oglesby. * * *

"Q. And what did Price say to him? * * * A. Because he tried to join the Marines. * * *

"Q. Now, did Julius say that ships or battleships had been sunk? A. He just said 'ships.'

"Q. One ship or more? A. He said 'Them ships.' He said he sunk two ships."

Sam Phelps testified that Price said that "Japan sunk some of the United States ships, and he said, 'I hope they will sink some more.' He made the remarks to Tony (Smith), something about getting in the Marines, that he couldn't get in the Marines. He said he went in there two or three times, and they called him up one day and they told him they didn't take any colored in the Marines."

William Oglesby testified that he had heard talking out in the aisle and came out to see what it was about and heard Sam Phelps asking Price, "Why would you live in a country and the only country that you know anything about and be against it?" and that Price had stated it was because he had failed to get into the Marines on account of his color.

Price, in answer to this testimony, stated that a conversation had taken place between him and Smith, Phelps, and Oglesby, on December 14, 1941, and that he had said to Smith, " 'Tony,' I says, 'is it true that Japan sunk the Battleship Repulse and the Prince of Wales?' And he says, 'I don't know. That is what they say.' I says, 'Yes. If it is so, there has been lies told about Japan's navy.' I says, 'It has been misrepresented.' And, in particular, I don't know where Bill Oglesby come from, but he was there, helping out at the same time. He says, 'Looks like you are glad of it.' He just continued from one word to another, I don't know what he said; I never talked to him very much. And, I walked away from him, and finally I went back to him. He continued to talk, and I says, 'Let me tell you, Bill, time after time you heard me say I only know one country, one place, and one language.' "

Price further testified that he had made no reference whatever to the United States Navy, and had referred to the two battleships, the Prince of Wales and the Repulse, and the Japanese Navy. He denied having said anything about any hope that the Japanese would sink American ships. With regard to the other matter, he stated that he had told of his exclusion from the Marines, some ten years before, while he was soliciting memberships in the National Association for the Advancement of Colored People; that this solicitation occurred at the plant during the first week of December, and not on the same occasion as the discussion about the sinking of the British ships; and that he had given his experience as an instance of national racial discrimination, which the N. A. A. C. P. was trying to overcome in government and industry. That he was soliciting such memberships in the plant during the time in question, appears from the evidence.

Whatever was said, the incident was reported to the assistant manager of the company, who discussed it with other officials and, according to his testimony, decided to make an official investigation. He asked various employees to find out the facts about Price and what he was supposed to have said, "and to be sure that if there were anything that could be found out favorable to Julius Price, to be sure and let me know." Neither these investigators nor any of the officials of the company in-

terrogated Price or mentioned the matter to him. On December 22, 1941, Price was discharged and given a separation slip, setting forth that the cause of his discharge was "improper attitude." Price stated that when he asked why he was discharged, Dr. Brandli, an official of the company, told him: "You know what you said two weeks ago." Price testified that he asked Dr. Brandli, " 'What did I say?' He said, 'You know what you said. You can check out now.' " Price testified that he did not know that he was discharged for having made disloyal statements, until the preliminary hearing before the Board, and that he was, at no time, ever given any other reason for his discharge than what Dr. Brandli told him. In this he is undisputed.

Price, at the time of his discharge, was a "new" man, having worked for respondent less than nine months. During approximately half of that period, he had been energetically engaged in Union organization and propaganda. He was the first Negro in the plant to join the Union. Of the two witnesses who testified that he made the statement in question, both were Negroes, members of the Association (opposed to the Union), and both were long time employees of the Company. Smith had worked for the concern six years, and Phelps, for 14 years. They both appear to have been satisfied with their treatment by the company, and from their length of service, undoubtedly felt a loyalty to it. Oglesby, who testified that he heard Phelps' question to Price, as to how he could be against the country, had been employed by the company for eight years, and was also a member of the Association. Price had been told by Scherm, a member of the Association and one of the workers who forwarded the orders of the superintendent to the men: "You always go around here preaching this and that, this and that and the other. * * * You see, Price, that is what I have been telling you all the time. You ain't been around here. You don't know like these old-timers around here. * * * They have been around here and they know."

Tension was high at respondent's plant during the Union activities. Some of the employees were surrendering their affiliation with the Union, and joining the Association. The management claimed that, after the Union was organized, it was threatening a strike. There was the ever-present issue of racial discrimination. There were continual accusations made by one of the labor organizations against the other, and against the management. After Price was discharged, there was a fist fight between two white workers. One of them, a member of the Union, started the fight by using his fists on the other, who was a member of the Association, because the latter had said that he would have reported Price for having made the statement. Officials of the company claimed that harmony and contentment among the workers were ruined by the unrest, discontent, and threats of strike, which were fomented by the Union organizers and leaders.

In addition to absolute denials of having made the statement attributed to him, and after explaining what the conversation was, Price testified that he was devoted to this country; that before Pearl Harbor, he had heard the President on the radio—about Labor Day—calling for sacrifice and asking that the citizens purchase Defense Bonds, and, as a result, shortly thereafter, he had purchased a $50 Defense Bond; that, subsequently, in October, hearing the President again calling for more purchases of bonds, he had bought another bond, in like amount; and that upon hearing a further radio address by the President, he had, in November, gone to the bank and drawn out $750, with which he purchased a $1,000 Defense Bond. He further testified that he was a regular attendant of his church; secretary of the men's Bible class; a member of the Y. M. C. A. until his marriage; and a regular contributor to that organization thereafter. It appears from the testimony of an official of the respondent, that he was a good worker. Oglesby testified that, at the time of the hearing, he was "pretty well respected by the boys out there."

Out of this welter of agitation, turmoil, threat, and conflict, the Trial Examiner was required to ascertain the facts. He was confronted by disputed testimony. He was faced by questions of veracity and credibility of witnesses, as well as inferences to be drawn from the testimony. Certain evidence on the part of the respondent, itself, might indicate that Price had been talking about the sinking of the Repulse and the Prince of Wales at the time of the conversation in question. Smith stated that Price said "two ships" had been sunk. Dr. Brunskill testified that Dr. Band-

li, after talking with witnesses to the conversation, had told him that they reported that Price had stated: "They sunk two of our ships. * * *" One does not, or did not at the time, think of the disaster of Pearl Harbor as the occasion of the sinking of two ships. If it were found that the conversation had been about the sinking of the Repulse and the Prince of Wales, the weight of the testimony of Smith and Phelps to the effect that Price was talking about American ships, would be greatly diminished, as would also, the testimony that Price said he hoped more American ships would be sunk. Moreover, the Examiner could take into consideration that all the witnesses against Price were members of the Association, with whom Price's union was struggling for control, and conclude, even though he might assume their good faith, that what Price said in the argumentative discussion was misunderstood by them. Price was a "new" man in the plant, a zealous Union member and leader, who challenged, and made light of, the Association of the old-time workers. He was described, in the language of one of the witnesses, as "shooting off his mouth again." In the midst of provocative discussions of race discrimination, and union activity, climaxed by the excitement of our entry into the war, it could be found by the Examiner that opponents in two labor organizations, participating in a discussion embracing these matters, might have, as a result of the heated feelings or resentment thereby kindled, mistakenly attributed discreditable views and statements to the other. Or the Examiner might disbelieve their testimony because of interest; though it must be said that their testimony, even in print, sounds like that of honest men. He might also attach importance to the undisputed testimony of Price that no official of the company ever accused him of making unpatriotic statements; that he was not charged with having made the statement in question when he was discharged; that the reason given in writing for his discharge was "improper attitude;" and that Price never knew, until the preliminary hearing before the Board, that he was discharged for having made a disloyal utterance. Counsel for respondent, in their brief, state that, "We have not, nor do we here charge Julius Price with being un-American," but that racial handicaps were no justification to "fly off the handle;" and to make the statement of which he is accused.

More important than other considerations in weighing the evidence, on the part of the Examiner, may have been the evidence of Price's support of the country in his repeated and considerable purchase of Defense Bonds at the call of the President, and his participation in church organizations and kindred activities. These could readily lead to inferences, on the part of the Examiner, that Price was not unpatriotic and not guilty of expressing the disloyal and treacherous statement.

Findings on the issue depended upon the determination of the veracity and credibility of various of the witnesses, and inferences to be drawn from the evidence. These are matters for the Board, and it is unnecessary to cite the numerous cases decided by the Supreme Court, in which we have been told that veracity and credibility of witnesses are for the Board; that this court cannot draw inferences contrary to those drawn by the Board; and that if there is substantial evidence to sustain the findings of the Board, we have not the power to review the evidence to set aside such findings.

It is notable in this strenuously contested case, in which the findings of the Examiner and the Board are so vehemently attacked, that there is not, as in many similar cases, any charge of prejudice or laxity on the part of the Examiner. On the argument, it was remarked that the Examiner was a member of the legal profession of long experience and distinction, having served in judicial capacities and, at present, occupying the office of a member of the board of governors of a state university. There was no claim of unfair conduct of the hearing. The finding of the Examiner, that Price did not make the disloyal statement, was concurred in by the Board, presumably, after an examination of the evidence, and a review of the arguments made before us by respondent. If, on this review, we were confronted by a jury's answer to a special interrogatory—or a finding of fact by a trial court—that Price had not made the statement in question, I do not believe we would reverse, for lack of evidence to sustain it; and, in view of the statute and controlling adjudications, the Board's finding on this issue should receive equal consideration.

There has been set forth in the foregoing, the evidence and inferences that might reasonably be drawn therefrom, in the

most favorable light possible, in order to sustain the finding of the Board that Price did not make the statement in question. There remains then, that portion of the finding that is decisive on the question of reinstatement of Price. On this point, the Board found that Price was discharged because of his union activity.

In passing upon this question, we must ascertain, if possible, why the company discharged Price. Of course, we do not hear this case de novo. But, if from the evidence, the conclusion is irresistible that the discharge was due, in whole or in part, to respondent's belief, in good faith, based upon grounds that would cause a reasonable person so to believe, that Price made the statement, respondent cannot be penalized and required to reinstate Price.

Respondent investigated the alleged statement of Price and interviewed the two men who were the only witnesses to the alleged remarks, and a third, who claimed to hear Price give the reason for being "against the only country" he knew anything about. All of these men were, like Price, Negro workers. They belonged to the Association, but there was no evidence of any personal feeling or antipathy on their part against Price—and Price does not claim that the membership of these witnesses in a different labor organization resulted in any feeling between the three men and himself. On the contrary, they all seem to have been on friendly terms before the conversation in question. There appears no ground for doubting that the respondent, in good faith and upon reasonable grounds, believed these three workmen. If it so believed that the statement in question was made by Price, it was justified in discharging him, even though inferences could be drawn that it was glad to get rid of him because of his union activities. It could not be said that it discharged him for union activities under the pretext of his disloyal statement, for such a statement, if made, in itself, called for his discharge. There is no evidence from which it can be inferred that the respondent did not in good faith believe—with reasonable cause to believe—that Price had made the statement that the witnesses claimed he made. And it may be remarked that the finding of the Examiner, concurred in by the Board, in nowise conflicts with this conclusion. On this point, the finding recited that the failure of the investigating official to question Price and the vague report of the investigators, led to the conclusion that these company representatives were not "free of doubt as to the truthfulness of the story attributing disloyalty to Price." It was not necessary to show that respondent was free from such a doubt, if its belief was in good faith and on reasonable grounds; nor was it necessary, in order to show such reasonable belief, for respondent to investigate Price's explanation. Even if it had learned everything from Price that his subsequent testimony disclosed, with regard to his explanation, and his purchase of war bonds, it was confronted by the direct and unequivocal statement of credible witnesses who were the only ones present at the conversation, that Price had made the disloyal remark. No additional investigation would have shown more than Price's denial and explanation, his profession of patriotism and purchase of Defense Bonds, and his religious and other similar affiliations. Knowledge of these facts would not have made it unreasonable to believe, in good faith, that he had made the disloyal statement in view of the persuasive evidence to that effect. It was not necessary for respondent to be convinced, to a moral certainty, beyond a reasonable doubt, that Price had made a disloyal statement. It was sufficient to have actually believed, upon reasonable grounds, that the alleged statement was made; and there is no evidence, nor can any inference be drawn from the evidence, that it did not have such a reasonable belief.

Petitioner cites several cases to the effect that failure of an employer to allow an employee to present his side of a matter in which he is accused of misconduct is indicative of a discriminatory motive for discharge. In one of the cited cases, employees were discharged, on advice of counsel, for having made threats against the property of the company; but there was conceded to be no evidence of such misconduct. The other cases were concerned with evidence of discrimination in discharge, between employees guilty of the same conduct; and failure of evidence to sustain proof of the alleged misconduct. None of them are applicable to the special facts in this case.

I concur in the decree of enforcement of the cease and desist order; and for the foregoing reasons, I concur in denial of the petition for enforcement of reinstatement.