WILLIAM J. HEILER, APPELLANT, v. GOODMAN'S MOTOR EXPRESS VAN AND STORAGE COMPANY, RESPONDENT.

Submitted July 8, 1918—Decided November 18, 1918.

1. Leave to withdraw a juror is a favor, not a right, and rests within the sound discretion of the trial court.
2. The defence of alien enemy, in order to be considered in an action at law, should be made a part of the record and stated with accuracy by an appropriate pleading, or motion under our present practice. It is not favored by intendment.
3. Plaintiff, a citizen of Germany residing in this state and earning his living here, sued for damages sustained by reason of a collision between his motorcycle and an automobile van. At the trial it appeared that he was born in Germany, had never been naturalized in this country, and was living and working in this state as aforesaid. *Held*, that it was improper to nonsuit him on the ground that he was an alien enemy, first, because the defence had not been pleaded or otherwise entered upon the record; secondly, because the alien enemy rule is not applicable to a citizen of an enemy country peaceably residing and doing business here with the implied license and permission of our government; there being nothing to show that he was within any of the classes denounced by the Trading with the Enemy act or any presidential proclamation.

On appeal from the Supreme Court, Hudson Circuit.

For the appellant, *John Winans.*

For the respondent, *Randolph Perkins.*

The opinion of the court was delivered by

PARKER, J.   The suit was to recover damages for personal injuries claimed to have been sustained by the plaintiff below by reason of a collision between a motorcycle on which plaintiff was riding and an automobile van belonging to and operated by a servant or servants of the defendant.   At the trial the plaintiff was nonsuited on the sole ground that he was an alien enemy of the United States and was, therefore, barred from maintaining an action.   This is urged as error, and also that the court refused the application of the plaintiff when the question of nonsuit was under consideration and argument, to withdraw a juror and award a mistrial.

The alienage of the plaintiff was not made to appear until the latter part of his cross-examination, and it is worth while to quote, at this point, the exact testimony in that regard:

"Q. You say—where were you born, Mr. Heiler?

"A. What's that?

"Q. Where were you born?

"A. Germany.

"Q. When?

"A. August 16, 1895.

"Q. Are you a naturalized American citizen?

"A. No, sir.

"Q. So you were born in Germany?

"A. Yes, sir.

"Q. You are not an American citizen?

"A. No, sir."

This seems to be everything in the testimony upon this point.   The alienage and enmity of plaintiff was not in any manner set up in the pleadings, nor was any application made at the trial to amend the answer or place this defence upon the record by a special motion as provided by the Practice act of 1912.   The motion was made as a motion to nonsuit, purely incidental to the progress of the trial upon a complete record.

The alleged error of the court in refusing to withdraw a juror may be dismissed in a few words, and, indeed, is in no

way essential to the determination of the main question now involved, although it is worth while to advert to it as a matter of practice. The general rule, as laid down recently by this court, is that the refusal to withdraw a juror and thereby produce a mistrial, is a matter that rests in the discretion of the trial judge, and is not assignable for error. *Bradley* v. *Cleary Company,* 86 *N. J. L.* 338. The same rule obtains in New York, where it has been said by the Court of Appeals of that state that "Leave to withdraw a juror is a favor, not a right, and has always been held to rest within the sound discretion of the court." *Cattano* v. *Metropolitan Street Railway Co.,* 173 *N. Y.* 565; 66 *N. E. Rep.* 563, 565; *Chesebrough* v. *Conover,* 140 *N. Y.* 382, 388; 35 *N. E. Rep.* 633, 635. Conceding for present purposes that exceptional circumstances might remove the case from the operation of this rule, we find nothing in the case at bar to justify such a course.

With respect to the granting of the motion to nonsuit, however, we consider that there was clear error, and this for two reasons: First, because the issue was not raised upon the pleadings; and secondly, and more fundamentally, because plaintiff was not shown to be within the class of alien enemies barred from maintaining an action, either by the rules of the common law, or under the recent statutes of congress applicable to that subject.

The fundamental rule as laid down in the books is that no action can be maintained, either by or in favor of an alien enemy. *Brandon* v. *Nesbitt,* 6 *T. R.* 23; 2 *E. R. C.* 649. But the rule seems to be equally well settled that this defence must be set up by a special plea. The authorities are somewhat confused as to whether the plea at common law was to be classified as a plea in abatement or a plea in bar, but, for present purposes, this is immaterial. 1 *Chit. Pl.* *481, *483, *514. The precision required in such a plea is indicated by our early case of *Coxe* v. *Gulick,* 10 *N. J. L.* 328, where the plaintiff was an alien, but not an enemy, and as such was disqualified by the existing law from holding real estate in

this state. A leading case is *Burnside* v. *Matthews,* 54 *N. Y.* 78, where the court intimated that if the defence had been properly set up, it would have prevailed, but refused to recognize it because it was not pleaded. Similar cases in Massachusetts, with annotations, are *Sewall* v. *Lee,* 9 *Mass.* \*363; *Martin* v. *Woods, Id.* \*378, and cases in the foot-note to page 366. In the English case of *Ex parte Boussmaker,* 13 *Ves.* 71, 33 *English Reprint* 221, Lord Chancellor Erskine remarked that a court of law would not take notice of the objection (of alien enemy) without a plea, and even in Chancery it was held that there was no presumption in favor of the plea and that the facts must be strictly set up. *Burk* v. *Brown,* 2 *Atk.* 397. Under the Practice act of 1912 and rules germane thereto, it would seem that this defence may be made by a motion substituted for plea in abatement (Rule 56 of 1903), or by answer if considered as a plea in bar at common law. The precise form in which the defence is put upon the record is not so material as that it shall be squarely placed upon the record and with reasonable precision corresponding to that required at common law. As already stated, this was not done, and the defence was, therefore, not maintainable as a matter of practice.

But there is a broader and more fundamental reason for holding that there was error in denying the plaintiff his right to prosecute the action, viz., that he was not shown to be within the class to which the rule is applicable. That rule, as just quoted from the English ruling cases, uses the words "alien enemy," but does not undertake to define or limit the term, although it has been most carefully defined in the cases, both in England and in this country. In the leading case of *Wells* v. *Williams,* 1 *Ld. Raym.* 282, defendant pleaded that the plaintiff was an alien enemy, and came into England without a safe conduct, and concluded in bar; to which the plaintiff replied that at the time of the making of the bond sued on, plaintiff was and still is in England by the license and under the protection of the king. To this the defendant demurred, but the court held that one who comes into the

country in time of peace without a safe conduct and lives here thereafter under the protection of the king, and the war afterwards begins between the two nations, may still maintain an action. The case is also reported in 1 *Salk.* 46, and *Lut.* 15.

In 1793 the case of *Daubigny* v. *Davallon* was decided by the Court of Exchequer, and without going into the precise issues of the case, it is sufficient to quote from the deliverance by Lord Chief Baron Macdonald in 2 *Anstr.* 462 (at *p.* 467):

"However the law may originally have stood, it is now settled that alien friends have a right to institute suits in the king's courts for recovery of their rights; they come into this country either, as was formerly the case, with a letter of safe conduct, or under a tacit permission which presumes that authority. So, if they continue to reside here after a war breaks out between the two countries, they remain under the benefit of that protection, and are impliedly temporary subjects of this kingdom. But if the right of suing for redress of the injuries they received were not allowed them, the protection afforded would be incomplete and merely nominal."

It is worthy of note that Judge Story, in his treatise on equity pleading, has frankly incorporated this deliverance into the text of his work. *Story Eq. Pl.,* § 52.

While, on the one hand, aliens who are subjects of a hostile country, but living and conducting their affairs within the jurisdiction by the sanction and under the protection of the government, are not included within the class of alien enemies to which the rule applies, so, on the other hand, natural-born subjects and citizens living within a hostile country and conducting their affairs there are brought within the rule by reason of those facts, and for a fundamental reason of public policy well recognized in the books, viz., that no benefit to the enemy country, direct or indirect, should be permitted to accrue or result from the maintenance of the action. And so, in a case where parties plaintiff, though

natural-born citizens, were resident and doing business in a hostile country, they were not permitted to maintain their claim in the English courts. *McConnell* v. *Hector, 3 Bos. & P.* 113; 127 *English Reprint* 61. In that case Lord Alvanley, Chief Justice, said:

"The question is whether a man who resides under the allegiance and protection of an hostile state for all commercial purposes, is not to be considered to all civil purposes as much an alien enemy as if he were born there? If we were to hold that he was not we must contradict all the modern authorities upon this subject."

The law was fully and, in our view, most satisfactorily laid down by Lord Reading, somewhat *obiter* perhaps, but justifiably, in view of the importance of the question, in a group of cases decided together, and which may be cited under the name of *Porter* v. *Freudenberg,* 1915, 1 *K. B.* 857, especially at pages 867 and 868, where he held that the object of the rule is to prevent anything that will be of advantage to the enemy state. "Trading with a British subject," he said, "or the subject of a neutral state carrying on business in the hostile territory is as much assistance to the alien enemy as if it were with a subject of the enemy nationality carrying on business in the enemy state, and, therefore, for the purpose of the enforcement of civil rights, they are equally treated as alien enemies. It is clear law that the test for this purpose is not nationality but the place of carrying on business." He cited the cases of *Wells* v. *Williams* and *McConnell* v *Hector, supra,* and also the more recent case of *Janson* v. *Driefontein Consolidated Mines,* 1902 *A. C.* 484, at pages 505-6, where it is held that "an Englishman carrying on business in an enemy's country is treated as an alien enemy in considering the validity or invalidity of his commercial contracts"; and, "again, the subject of a State at war with this country, but who is carrying on business here or in a foreign neutral country, is not treated as an alien enemy; the validity of his contracts does not depend on his nationality, nor even on what is his real domicile, but on the place or places where he carries on his

business or businesses." Lord Reading, in the Porter case,
criticised this passage as somewhat inaccurate, because the
court had in mind only a trading corporation as a party, and
did not deal with persons residing and not doing business in
enemy territory.

The doctrine that place of residence and of conducting
business is an essential test in the application of the rule of
alien enemy was recognized in this country as early as 1812,
and by so eminent an authority as Chancellor Kent, then
sitting as Chief Justice of the State of New York, in the case
of _Clarke_ v. _Morey,_ 10 _Johns._ 69. The plea in that case set
up that the plaintiff was an alien enemy, to wit, a subject of
Great Britain, with which the United States was at war, and
had not been made a citizen of the United States by natural-
ization or otherwise, but entered and came into the United
States and still remains therein without any letters of safe
conduct from the president of the United States, or any
license to be, reside or remain therein. To this the plaintiff
demurred, and Chief Justice Kent, after dealing with the
technical sufficiency of the plea, said that it would be pre-
sumed from the record that plaintiff came to reside here be-
fore the war and, therefore, no letters of safe conduct nor
license from the president were required; that the license is
implied by the law and the usage of nations; if he came here
since the war, a license is also implied and the protection
continues until the executive shall think proper to order the
plaintiff out of the United States, but that no such order is
stated or averred. He called attention to the fact that the
act of congress of July 6th, 1798, respecting alien enemies,
granted permission to the alien to remain, though his sov-
erign be at war with us. "A lawful residence," he said, "im-
plies protection and a capacity to sue and be sued. A con-
trary doctrine would be repugnant to sound policy no less
than to justice and humanity." Further on, he added, "And
it has now become the sense and practice of nations and may
be regarded as the public law of Europe (the anomalous and
awful case of the present violent power on the continent ex-

cepted), that the subjects of the enemy (without confining the rule to merchants), so long as they are permitted to remain in the country are to be protected in their persons and property, and to be allowed to sue as well as to be sued." This decision seems to have stood ever since as the law. The recent New York case of *Arndt-Ober* v. *Metropolitan Opera Co.*, 182 *N. Y., App. Div.* 513, is to the same effect. There are several recent cases on the subject in the Court of Chancery of this state, particularly that of *Tortoriello* v. *Seghorn*, 103 *Atl. Rep.* 393, where Vice-Chancellor Foster points out that subjects of the German empire residing in this country and not within the act known as the Trading with the Enemy act of October 6th, 1917, or the proclamation of the president, dated February 5th, 1918, are not disqualified as alien enemies from performing a contract into which they had entered. He says most pertinently:

"Congress, in the Trading with the Enemy act, aside from the power thereby vested in the President, has made the test of enemy character depend upon residence, or official or agency relation, and not upon nationality or merely alienage. The President by his proclamation has extended the ban upon trading only to such aliens as have been or may be arrested and interned in the custody of the war department for the duration of the war. * * * As a result of this forbearance, aliens not so classified have been at liberty to continue in the pursuit of their business and trade, including the receipt, banking and expenditure of money belonging to them without the slightest governmental interference or supervision."

The pertinent sections of the act of congress are quoted in the opinion just cited, and need not be here repeated. It is sufficient to note that this act was probably passed with due consideration of the equitable and just rule of the common law laid down in both the English and American decisions.

When we come to apply the rule to the case at bar, there is absolutely nothing to show that the plaintiff was either within

the class of alien enemy to which the common law rule applies, or within the inhibitions of the act of congress or the presidential proclamation. All that appears is that he was of German birth, residing in this country. He was engaged in an apparently peaceful and beneficial occupation in Bayonne, going from and returning to Hoboken every day. The presumption was and is that he is within the class of peaceable citizens of the enemy country living here under the protection of our laws and attending to their every-day affairs without participation in the hostilities. To say that such a person should not be allowed to sue for the purpose of collecting his daily wages, or bring an action of damages for assault and battery upon him, or, as in the present case, an action of damages for personal injury sustained by reason of alleged negligence, is to run counter to the rule laid down by so many decisions, of which a few have been cited above. Clearly he was entitled to maintain his action and not wait until the ending of the war, at which time the evidence of important witnesses might be lost or other things might happen which would seriously interfere with the proper presentation of the case. Whether, in case plaintiff should secure a verdict and judgment, he should be permitted to collect the judgment, is a matter not before us at this time, and is more properly for the consideration of the official alien property custodian in view of such facts as may be ascertained by him touching the actual relations of plaintiff with the land of his birth and allegiance, not appearing in the printed book before us. Upon that record, the judgment of nonsuit must be reversed and the case remanded for a *venire de novo.*

*For affirmance*—None.

*For reversal*—The Chancellor, Chief Justice, Swayze, Trenchard, Parker, Bergen, Minturn, Kalisch, Black, White, Heppenheimer, Williams, Taylor, Gardner, JJ. 14.