[S. F. No. 18522. In Bank. Jan. 18, 1955.]

MABEL BLACK et al., Respondents, v. CUTTER LABORATORIES (a Corporation), Appellant.

Johnson & Stanton, Gardiner Johnson and Thomas E. Stanton, Jr., for Appellant.

Edises & Treuhaft, Bertram Edises, Henry F. Saunders and Edises, Treuhaft, Grossman and Grogan for Respondents.

Charles R. Garry, George G. Olshausen, Charles P. Scully, Arthur J. Goldberg, Wirin, Rissman & Okrand, A. L. Wirin, Fred Okrand, Abraham Gorenfeld, Jay A. Darwin and Lawrence Speiser as Amici Curiae on behalf of Respondents.

SCHAUER, J.—Cutter Laboratories, Inc., appeals from a judgment entered upon the granting of an order confirming the award of an arbitration board. (See Code Civ. Proc., §§ 1291-1293.) By the award, rendered by two of the three arbitrators with the third dissenting, it was held that appellant (hereinafter sometimes termed the company) had discharged one of its employes in violation of a collective bargaining agreement between appellant and the Bio-Lab Union (hereinafter sometimes called the union) of Local 225, United Office and Professional Workers of America, and that the employe was entitled to reinstatement and to back pay limited by the bargaining agreement to eight weeks regular pay less any outside earnings or unemployment compensation received during such period. We have concluded that, upon the undisputed evidence and upon the facts found by the arbitration board, the company is correct in its contention that the arbitrators exceeded their powers, that the award is contrary to law, that it would contravene public policy for the courts of this state to enforce reinstatement of the discharged employe, and that the judgment must therefore be reversed.

From extensive findings made by the arbitration board it appears that the employer, Cutter Laboratories, Inc., with offices and laboratories located in Berkeley, manufactures and sells throughout the United States and certain foreign countries vaccines, serums, antitoxins and other antibiotics for both civilian and military use. During World War II

the company was subject to stringent security control by federal authorities, and its products and processes are said to be peculiarly subject to sabotage. Since World War II the company has been under no specific contract obligation to any governmental agency to discharge employes who are "bad security risks"; any obligation to take such steps grows out of the duties it owes generally to its customers, its dealers, its employes, and its stockholders.

The Bio-Lab Union of Local 225, United Office and Professional Workers of America C.I.O., was recognized in February, 1944, by the company pursuant to a National Labor Relations Board election. It is a union "generally denominated as 'left-wing'" and it as well as the U.O.P.W.A. was expelled from the C.I.O. in March, 1950.

The discharged employe, Mrs. Doris Walker, graduated from the University of California School of Jurisprudence in 1942, and is an active member of The State Bar of California. She was elected to Phi Beta Kappa and to the editorial board of the California Law Review. From 1942 to 1944 she was employed as an enforcement attorney with the federal Office of Price Administration in San Francisco and from 1944 to 1946 as an attorney with a firm of lawyers in the same city. She left the law firm and secured employment as a cannery worker sorting and trimming vegetables in three canneries in Oakland and San Francisco and (later in 1946) as an organizer for the Food and Tobacco and Agricultural Workers Union. She testified that she went to law school "because I was interested in becoming a labor lawyer" and that she left the law firm because her "time was spent on routine civil matters . . . and I became dissatisfied with my work and felt that I would rather take a more active role in the field in which I was interested and so I quit in order to take a job in a plant."

In October, 1946, Mrs. Walker sought employment at Cutter Laboratories and filled out an application form supplied by the company, on which under the heading of "Education" she concealed her attendance at law school, her law degree, and her admission to practice law in this state. Under the heading "Previous Employment" she concealed her entire previous employment record and showed a false employment as file clerk for six or eight months in 1939 by "John Tripp Att'y," which the company later discovered to be a fictitious name. Mrs. Walker also gave a dentist and a lawyer in San Francisco as references, but at her request their letters

of recommendation to the company did not reveal her subter-fuge. She states that she intentionally deceived the company because of her belief it would not employ her if she were truthful. The company hired her as label clerk in its production planning department, and in April, 1949, she became a clerk typist in the purchasing department.

At the company plant Mrs. Walker became active in union affairs and in April, 1947, was elected shop chairman and also a member of the executive board of Local 225. Late in 1948 she was elected chief shop steward; her duties as steward took her to all departments in the plant except the executive and administrative departments and primarily entailed representing the union in grievances arising under its collective bargaining agreement with the company. In the spring of 1949 she was elected president of Local 225; her term expired December 15, 1949, and a new president was elected.

Meanwhile, in May, 1946, following proceedings before the National Labor Relations Board, the company and the union entered into a contract; in January, 1947, the wage provisions thereof were opened and a 10 cent hourly wage increase agreed upon. In April, 1947, Mrs. Walker had been elected shop chairman and during the same month she and another union official learned that they were being investigated by the company as to past employment, character, and Communist affiliation. In June, 1947, the union served notice of intention to amend the contract and at the same time filed with the National Labor Relations Board an unfair labor practice charge against the company based on the investigations. A week-long strike ensued in August, 1947, which was settled following the intervention of Harry Bridges and as a result of negotiation with him. June 9, 1949, the contract was again opened, solely as to wages, and November 30, 1949, a two-year contract was agreed upon; on October 6, 1949, during the negotiations and at a time when company officials were angry at certain activities of Mrs. Walker purportedly in connection with union demands, the company's discharge of Mrs. Walker which is here involved took place.

At the time of the discharge a company official read to Mrs. Walker the following notice:

"Mrs. Walker: As you are aware, the company has known for some time that when you applied for work with Cutter Laboratories on October 4 1946, you made a number of false representations on your 'Application for Employment'.

"As we know now, you falsified the statement of your education so as to conceal the fact that you had completed a law shcool [sic] course at the University of California's School of Jurisprudence at Berkeley in May, 1942. You concealed the facts that you received the degree of Bachelor of Laws in May, 1942, and that you were admitted to the State Bar of California on December 8, 1942. You concealed that since that date you have at all times been admitted and entitled to practice as an attorney before all of the Courts of California.

"We know now that by falsification of the name of a previous employer, you concealed the fact that from June, 1942 to February, 1944 you were employed by the Federal Government's Office of Price Administration, including employment as an Enforcement Attorney at a salary of about $3,200.00 a year.

"We know now that you deliberately concealed from us that from February 1944 to December, 1945 you were employed as an attorney by Gladstein, Grossman, Sawyer and Edises, a well-known firm of lawyers specializing in labor cases.

"You know that a few weeks ago the 'Labor Herald', the official CIO newspaper, stated that the National Labor Relations Board had sustained a cannery firm that had discharged you for refusing to answer whether or not you were a Communist.

"We have checked the records. We know now that you deliberately concealed that in 1946, just before you applied for work here, you were employed by a series of canneries and had been discharged by them.

"Ordinarily, an employee of the Company would be discharged immediately for falsifying material facts on an 'Application for Employment'. Because you were an officer of the Union we kept you on the pay roll rather than open ourselves to a charge of persecuting a union officer. We have given your case careful consideration because we know very well that no matter how strong the case against you there will be a claim of discrimination because of union activities.

"Because no employer wants to become involved in a dispute of that kind we have been patient and deliberate in our consideration of your misconduct.

"On October 1, 1948, when you testified under oath before a Trial Examiner of the National Labor Relations Board, you refused to answer the question as to whether or not you were a member of the Communist Party.

"You refused to answer under oath the question as to

whether or not you were or had been a member of the Federal Workers' Branch No. 3 of the Communist Party.

"You refused to testify under oath whether or not you were or had been a member of the South Side Professional Club of the Communist Party.

"We are convinced now, that you were and still are a member of the Communist Party, that you were a member of the Federal Workers' Branch No. 3 of the Communist Party, and that you were a member of the South Side Professional Club of the Communist Party.

"Our recent investigation of your past record has uncovered previously unknown conduct that goes far beyond a mere concealment of material facts. We have just completed a thorough investigation and have a full report upon your past activities. We realize now the importance of the facts that you concealed from us. We realize the full implications of your falsification and misrepresentations. A follow-up and investigation of the 'Labor Heralds' recent revelations has uncovered a situation far more grave than we expected.

"We are convinced now that for a number of years, you have been and still are a member of the Communist Party. We are convinced beyond any question that for a number of years you have participated actively in the Communist Party's activities.

"The nature of our company's business requires more than the usual precaution against sabotage and subversion. Upon a disclosure that any employee is a member of the Communist Party, or has participated in other subversive or revolutionary activity, we conceive it to be the responsibility of management to take action.

"Confronted with such a situation, any inclination to be lenient or to grant a union official special consideration is out. In the face of your record there is no alternative open to us except to terminate your services at once. Accordingly, you are notified now that you are discharged for the causes mentioned. You will be paid the full amount due to you promptly."

"Shortly after" the notice was read to Mrs. Walker, it was likewise read to plant employes at a meeting called by the company. At the meeting statements were made by company officials "either to the entire group or in private discussion afterward, advising employees 'to get out of that left-wing union' and telling them that 'nothing but a left-wing union would press for wage increases at this time.'" Following the discharge of Mrs. Walker negotiations between the union and

the company continued, and as already mentioned a two-year contract was agreed upon on November 30, 1949; it provided for wage increases and other contract changes. The company also agreed to, and did, pending the holding of a union-shop election, join the union in urging all eligible employes and all newly-hired eligible employes to become and remain members in good standing of the union.

The arbitration board further found that on October 5, 1949, following a grievance meeting with union representatives earlier in the day and prior to discharging Mrs. Walker on October 6, officials of the company met with its attorneys and considered evidence which the attorneys had marshalled and which may be summarized as follows:

a. State Bar records showed no California lawyer named John Tripp (a name given by Mrs. Walker to the company, as a previous employer), but that there was such a lawyer with the given names of John Tripp; it developed that he was Mrs. Walker's supervisor in the O.P.A. (1942-1944).

b. A transcript of N.L.R.B. hearings of September 30 and October 1, 1948, in proceedings by discharged cannery workers, including Mrs. Walker, for reinstatement with back pay, showed a refusal by Mrs. Walker to answer the question, "are you or were you ever a member of the Communist Party?"

c. Statements to the following effect which appeared in certain of the Reports of the Joint Fact-Finding Committee on Un-American Activities in California for the years 1943, 1945, 1947, 1948 and 1949: That Mrs. Walker's O.P.A. supervisor associated with persons said to be "members of the Communist Party organization"; that "attorneys for the Communist Party are" the firm of labor lawyers by whom Mrs. Walker was employed in 1944 to 1946; reporting the identity of the Communist Political Association with the Communist Party despite a change of name "for strategic reasons May 20-23 1944"; giving a biography of one Archie Brown, an admitted Communist Party member and a candidate for various public offices on that ticket and mentioning sponsors of his from various unions including the United Office and Professional Workers of America; and indicating that the "People's Daily World," a newspaper, is "the official organ of the Communist Party on the west coast."

d. Four issues of the "People's Daily World" contained items concerning Mrs. Walker: her employment by the labor law firm in February, 1944, was mentioned; she was listed as

a 1944 alternate delegate to a State Committee of "the Communist Political Association"; and in October, 1946, a radio program was noted which she conducted on behalf of a committee "for Archie Brown for Governor . . . the Communist write-in candidate."

e. A photostatic copy of an unaddressed handwritten letter dated "7/10/46" and signed with Mrs. Walker's maiden name discussed the propriety of the introduction of a resolution on the maritime strike at the Cannery Workers Club by the writer and another, and stated that "I tried to evaluate my action, as I try to evaluate whatever I do, from the point of view of the welfare of the working class and the strengthening of the Party."

f. Two "unidentified undated documents contained biographical material" about Mrs. Walker and stated, among other things, that she was issued 1945 Communist Party membership card No. 40360, that she joined the Communist Party in 1942 and had held various positions in various clubs and sections of the party including the "Cannery Club," that her present husband was a Communist Party member and organizer, and that, in February, 1946, she listed on a Communist Party interview form the information that "she gave up law practice because it was frustrating to work with people she had to work with (namely, professional people)."

Mrs. Walker was not shown the above described evidence when she was discharged, but was confronted with it at the arbitration board hearing, and company attorneys asked her a series of questions concerning it and her Communist affiliations and activities, including the questions, "Are you now or have you ever been a member of the Communist Party?" and "Isn't it a fact, Mrs. Walker . . . that the reason why you sought employment . . . at Cutter Laboratories was because you felt and believed, and had it in mind, that by obtaining that employment at that plant you could more actively and more effectively carry on the program and the activities of the Communist Party?" Mrs. Walker's attorney objected to the questions on the grounds, among others, that the political affiliations of an employe are immaterial and that by not acting more promptly the company had waived the Communism issue as a ground for discharge. The board overruled the objections but also announced that Mrs. Walker would not be instructed to answer the questions "if she did not care to do so, but that if she refused to answer we would draw all justifiable inferences from the refusal." Mrs. Walker

thereupon refused to answer the questions as an "unwarranted invasion into my private beliefs." The evidence as to her Communist membership and acceptance of party principles, with all the implications that flow therefrom, thus stands unchallenged and uncontradicted by her and clearly supports the board's finding that the company honestly and correctly believed her to be a knowing and deliberately acting Communist.

It was further found by the board that the company's 1947 investigation of Mrs. Walker indicated that she was a Communist and also disclosed most of the omissions and falsifications in her application for employment, that "a strong case" had been made out that in 1948 the company learned of her cannery activities and of the cannery hearings, and that there was "at least a general indifference on the part of the Company about Doris Walker's activities until the autumn of 1949 and a specific indifference about obvious . . . clues to her background." The company stated that the reason they did not discharge Mrs. Walker in 1947 was because of a desire to "lean over backward" rather than to be accused of harassing union officials and because company attorneys advised that there was at that time insufficient evidence to support a discharge.

Under the provisions of the collective bargaining agreement in effect when Mrs. Walker was discharged, the company had agreed not to interfere with, restrain or coerce employes or discriminate against them because of *membership or lawful activity* in the union. It further agreed that, except for personnel reductions for lack of work or to effect economies, it would not discharge an employe "except for just cause." Both the union and the company also agreed that they will not discriminate against "a present or prospective employee or member because of race, color, creed, national origin, religious belief, or Union affiliation"; formerly "political" as well as "religious belief" was listed in this contract provision, but by negotiation the word "political" was amended out of the agreement. The board held that although removal of the word "political" seemed to authorize the practice of discrimination because of "political belief," "we are unable to conclude" that the company's agreements not to discriminate because of union activity and not to discharge except for just cause were thereby limited or modified "in such a way as to dispose of this dispute." In this connection it is to be noted that the old hoax that the Communist Party is but a political

party has been effectively exposed, as is hereinafter shown in some detail.

The company at the board hearings advanced two grounds as the basis for discharging Mrs. Walker: "the omissions and falsifications in the Application for Employment and membership in the Communist Party with the full implications of dedication to sabotage, force, violence and the like, which Party membership is believed to entail." Although finding that the company "honestly believed all of these things," and that the "accuracy of those beliefs is established in the record," the board further found that the company had not satisfactorily explained the delay of two years (from 1947 to 1949) in asserting the grounds for discharge presented to the board and that such grounds were therefore stale. Finally, it was found by the board that the reasons assigned by the company were not its real reasons for discharging Mrs. Walker, and that actually the discharge, which occurred during wage negotiations, was "retaliatory in nature" and "interfered with, restrained and coerced an employee because of participation as an officer and negotiator on behalf of the Union in a wage negotiation." As already stated, the board's award, based on the above findings, was that the company's discharge of Mrs. Walker violated the collective bargaining contract provisions against discrimination *because of union activity* and against discharging *except for just cause,* and that she is entitled to reinstatement and to limited back pay. The company failed to comply with the award, the union petitioned the superior court for its confirmation, and the company asked the court that it be vacated. (See Code Civ. Proc., §§ 1287, 1288.) After a hearing the trial court confirmed the award, and this appeal by the company followed.

Section 1288 of the Code of Civil Procedure provides, so far as here material, that "In either of the following cases the superior court . . . must make an order vacating the award, upon the application of any party to the arbitration: . . .

"(d) Where the arbitrators exceeded their powers . . ."

As ground for reversal the company contends, among other things and as it contended before the trial court in seeking vacation of the award, that an arbitration award which directs that a member of the Communist Party who is dedicated to that party's program of "sabotage, force, violence and the like" be reinstated to employment in a plant which produces antibiotics used by both the military and

civilians is against public policy, as expressed in both federal and state laws, is therefore illegal and void and will not be enforced by the courts. With this contention we agree.

In the case of *Loving & Evans* v. *Blick* (1949), 33 Cal.2d 603 [204 P.2d 23], this court reversed a judgment confirming an arbitrator's award of a disputed sum owing under a building contract where it appeared that only one of the partners of the contracting firm was licensed as required by statute, and that neither the other partner nor the partnership held such a license. After referring to the principles that (p. 607) "a contract made contrary to the terms of a law designed for the protection of the public and prescribing a penalty for the violation thereof is illegal and void, and no action may be brought to enforce such contract" and that (p. 609) "ordinarily with respect to arbitration proceedings 'the merits of the controversy between the parties are not subject to judicial review' [citation] and that 'arbitrators are not bound by strict adherence to legal procedure and to the rules on the admission of evidence expected in judicial trials," it was held (p. 610) that the "power of the arbitrator to determine the rights of the parties is dependent upon the existence of a valid contract under which such rights might arise," that "Section 1281 of the Code of Civil Procedure, providing for submission to arbitration of 'any controversy . . . which arises out of a contract,' does not contemplate that the parties may provide for the arbitration of controversies arising out of contracts which are expressly declared by law to be illegal and against the public policy of the state," that (p. 611) "an unlawful transaction cannot be given legal vitality by the arbitration process," that (p. 614) "the only evidence before the trial court showed without contradiction that the contract upon which the award was based was illegal and void because of respondents' failure to comply with the licensing requirements," and that therefore that court had erred in confirming the award. And in *Franklin* v. *Nat C. Goldstone Agency* (1949), 33 Cal.2d 628, 630-633 [204 P.2d 37], a judgment confirming an arbitration award in favor of unlicensed contractors was likewise reversed upon the ground that the basic contract was illegal because in violation of the statutes and of "the public policy of this state."

It is at once apparent that the controversy now before us presents an even stronger case for refusal to confirm the award than was involved in the Loving & Evans and in the Franklin cases. There the illegality was held to exist in the

contracts upon which the awards were based, while here the very award itself is illegal in that it orders reinstatement as an employe of one whose dedication to and active support of Communist principles and practices stands proved and unchallenged in the record. As is hereinafter shown, the true implications of knowing membership in and support of the Communist Party are no longer open to doubt, and the long overworked party line theme that Communism is but a political activity has been exposed as a false and fraudulent stratagem designed particularly as a device for securing, in the free nations having government by law, legal support for the "party" in carrying on to the end of its illegal objectives.

The Congress of the United States, in adopting the Internal Security Act of 1950, declared the dangers of the Communist movement in the following terms (Act of Sept. 23, 1950, ch. 1024, tit. I, § 2, 64 Stats. 987; 50 U.S.C.A. § 781):

"As a result of evidence adduced before various committees of the Senate and House of Representatives, the Congress finds that—

"(1) There exists a world Communist movement which in its origins, its development, and its present practice, is a world-wide revolutionary movement whose purpose it is, by treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization.

"(2) The establishment of a totalitarian dictatorship in any country results in the suppression of all opposition to the party in power, the subordination of the rights of individuals to the state, the denial of fundamental rights and liberties which are characteristic of a representative form of government, such as freedom of speech, of the press, of assembly, and of religious worship, and results in the maintenance of control over the people through fear, terrorism, and brutality. . . .

"(9) In the United States those individuals who knowingly and willfully participate in the world Communist movement, when they so participate, in effect repudiate their allegiance to the United States, and in effect transfer their allegiance to the foreign country in which is vested the direction and control of the world Communist movement. . . .

"(15) The Communist movement in the United States is an organization numbering thousands of adherents, rigidly

and ruthlessly disciplined. Awaiting and seeking to advance a moment when the United States may be so far extended by foreign engagements, so far divided in counsel, or so far in industrial or financial straits, that overthrow of the Government of the United States by force and violence may seem possible of achievement, it seeks converts far and wide by an extensive system of schooling and indoctrination. Such preparations by Communist organizations in other countries have aided in supplanting existing governments. The Communist organization in the United States, pursuing its stated objectives, the recent successes of Communist methods in other countries, and the nature and control of the world Communist movement itself, present a clear and present danger to the security of the United States and to the existence of free American institutions, and make it necessary that Congress, in order to provide for the common defense, to preserve the sovereignty of the United States as an independent nation, and to guarantee to each State a republican form of government, enact appropriate legislation recognizing the existence of such world-wide conspiracy and designed to prevent it from accomplishing its purpose in the United States.''

And in the Smith Act (Act of June 25, 1948, ch. 645, 62 Stats. 808; 18 U.S,C.A. § 2385) it was provided that ''Whoever knowingly or willfully advocates, abets, advises, or teaches the . . . overthrowing or destroying the government of the United States or . . . of any State . . . by force or violence, or . . . Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who . . . encourage the overthrow or destruction of any such government by force or violence; or becomes or is a member of, or affiliates with, any such . . . assembly of persons, knowing the purposes thereof'' is guilty of a crime.

More recently, in adopting the Communist Control Act of 1954 (Public Law 637, ch. 886, approved August 24, 1954), our Congress further expressed its, and necessitates our, awareness of the true nature of the party program and methods, in these findings of fact: ''Sec. 2. The Congress hereby finds and declares that the Communist Party of the United States, although purportedly a political party, is in fact an instrumentality of a conspiracy to overthrow the Government of the United States. It constitutes an authoritarian dictatorship within a republic, demanding for itself the rights and privileges accorded to political parties, but denying to all others the liberties guaranteed by the Consti-

tution. Unlike political parties, which evolve their policies and programs through public means, by the reconciliation of a wide variety of individual views, and submit those policies and programs to the electorate at large for approval or disapproval, the policies and programs of the Communist Party are secretly prescribed for it by the foreign leaders of the world Communist movement. Its members have no part in determining its goals, and are not permitted to voice dissent to party objectives. Unlike members of political parties, members of the Communist Party are recruited for indoctrination with respect to its objectives and methods, and are organized, instructed, and disciplined to carry into action slavishly the assignments given them by their hierarchical chieftains. Unlike political parties, the Communist Party acknowledges no constitutional or statutory limitations upon its conduct or upon that of its members. The Communist Party is relatively small numerically, and gives scant indication of capacity ever to attain its ends by lawful political means. The peril inherent in its operation arises not from its numbers, but from its failure to acknowledge any limitation as to the nature of its activities, and its dedication to the proposition that the present constitutional Government of the United States ultimately must be brought to ruin by any available means, including resort to force and violence. Holding that doctrine, its role as the agency of a hostile foreign power renders its existence a clear present and continuing danger to the security of the United States. It is the means whereby individuals are seduced into the service of the world Communist movement, trained to do its bidding, and directed and controlled in the conspiratorial performance of their revolutionary services. Therefore, the Communist Party should be outlawed.''

A similar awareness was shown by the President of the United States in his State of the Union message delivered before a joint session of the Senate and the House of Representatives on January 7, 1954 (100 Congressional Record 62, H. Doc. 251), wherein he declared, ''The subversive character of the Communist Party in the United States has been clearly demonstrated in many ways, including court proceedings. We should recognize by law a fact that is plain to all thoughtful citizens—that we are dealing here with actions akin to treason—that when a citizen knowingly participates in the Communist conspiracy he no longer holds allegiance to the United States.''

And in this state the courts have recognized that the type of activity found by the board here to have been engaged in by Mrs. Walker—i.e., membership "in the Communist Party with the full implications of dedication to sabotage, force, violence and the like, which Party membership is believed to entail"—constitutes a violation of the California Criminal Syndicalism Act. (Pen. Code, §§ 11400-11402, formerly Deering's Gen. Laws, Act 8428; see *People* v. *McCormick* (1951), 102 Cal.App.2d Supp. 954, 962 [228 P.2d 349]; *People* v. *Chambers* (1937), 22 Cal.App.2d 687, 709-713 [72 P.2d 746].)

The Legislature of California itself has found as facts, and has so declared in section 1027.5 of the Government Code, that ". . . (a) There exists a world-wide revolutionary movement to establish a totalitarian dictatorship based upon force and violence rather than upon law. . . .

"(d) Within the boundaries of the State of California there are active disciplined communist organizations presently functioning for the primary purpose of advancing the objectives of the world communism movement, which organizations promulgate, advocate, and adhere to the precepts and the principles and doctrines of the world communism movement. These communist organizations are characterized by identification of their programs, policies, and objectives with those of the world communism movement, and they regularly and consistently cooperate with and endeavor to carry into execution programs, policies and objectives substantially identical to programs, policies, and objectives of such world communism movement. . . .

"There is a clear and present danger, which the Legislature of the State of California finds is great and imminent, that in order to advance the program, policies and objectives of the world communism movement, communist organizations in the State of California and their members will engage in concerted effort to hamper, restrict, interfere with, impede, or nullify the efforts of the State and the public agencies of the State to comply with and enforce the laws of the State of California . . ."

Further evidencing the implications of membership in the Communist Party and the policy of the state in respect thereto, the Legislature has declared that (Gov. Code, § 1028): "It shall be sufficient cause for the dismissal of any public employee when such public employee advocates or is knowingly a member of the Communist Party or of an organiza-

tion which during the time of his membership he knows advocates overthrow of the Government of the United States or of any state by force or violence.'' (See also *Board of Education* v. *Wilkinson* (1954), 125 Cal.App.2d 100 [270 P.2d 82].) ■ A private employer, particularly one largely engaged in supplying manufactured products to the government, to its armed forces, and to retailers for distribution through hospitals and doctors to the public at large, should not be required by state action through its courts (see *Shelley* v. *Kraemer* (1948), 334 U.S. 1 [68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441]; *Hurd* v. *Hodge* (1948), 334 U.S. 24 [68 S.Ct. 847, 92 L.Ed. 1187]) to retain in or restore to employment a person who would not be entitled to state employment and who is known to have dedicated herself to the service of a foreign power and to the practice of sabotage to the end of overthrowing our government.

Graphically depictive of the nature of the Communist conspiracy and of the extremes to which it is prepared to resort are the following statements by Mr. Justice Jackson, concurring in *Dennis* v. *United States* (1951), 341 U.S. 494, 564-565 [71 S.Ct. 857, 95 L.Ed. 1137, 1181] : ''The Communist Party, nevertheless, does not seek its strength primarily in numbers. Its aim is a relatively small party whose strength is in selected, dedicated, indoctrinated, and rigidly disciplined members. From established policy it tolerates no deviation and no debate. It seeks members that are, or may be, secreted in strategic posts in transportation, communications, industry, government, and especially in labor unions where it can compel employers to accept and retain its members. It also seeks to infiltrate and control organizations of professional and other groups. Through these placements in positions of power it seeks a leverage over society that will make up in power of coercion what it lacks in power of persuasion.

''The Communists have no scruples against sabotage, terrorism, assassination, or mob disorder; but violence is not with them, as with the anarchists, an end in itself. The Communist Party advocates force only when prudent and profitable. Their strategy of stealth precludes premature or uncoordinated outbursts of violence, except, of course, when the blame will be placed on shoulders other than their own. They resort to violence as to truth, not as a principle but as an expedient. Force or violence, as they would resort to it, may never be necessary, because infiltration and deception may be enough.

"Force would be utilized by the Communist Party not to destroy government but for its capture. The Communist recognizes that an established government in control of modern technology cannot be overthrown by force until it is about ready to fall of its own weight. Concerted uprising, therefore, is to await that contingency and revolution is seen, not as a sudden episode, but as the consummation of a long process."

Other instances of recognition by the courts of the clear and present danger to this country and to its institutions presented by the Communist Party and its adherents may be found in decisions upholding the provisions of the Labor Management Relations Act of 1947, also known as the Taft-Hartley Act, (Act, June 23, 1947, ch. 120, § 1 et seq.; 61 Stats. 136 et seq.; 29 U.S.C.A. § 141 et seq.), which deny the privilege of being chosen as exclusive bargaining agent to a union whose officers have not filed with the National Labor Relations Board their affidavits denying membership or affiliation with the Communist Party and denying belief in the overthrow of the United States Government by force (see *American Communications Assn., C.I.O.* v. *Douds* (1950), 339 U.S. 382 [70 S.Ct. 674, 94 L.Ed. 925]; *National Maritime Union of America* v. *Herzog* (D.C., 1948), 78 F.Supp. 146, affirmed 334 U.S. 854 [68 S.Ct. 1529, 92 L.Ed. 1776]; *Inland Steel Co.* v. *National Labor Relations Board* (C.C.A. 7, 1948), 170 F.2d 247, 264-267, affirmed 339 U.S. 382 [70 S.Ct. 674, 94 L.Ed. 925]), as well as in cases sustaining other legislation or Congressional inquiry directed at exposing and controlling Communist activities in this country. (See *Lawson* v. *United States* (C.C.A., D.C., 1949), 176 F.2d 49, certiorari denied, 339 U.S. 934 [70 S.Ct. 663, 94 L.Ed. 1352]; *United States* v. *Dennis* (C.C.A., 2, 1950), 183 F.2d 201, 212-213, affirmed, *Dennis* v. *United States* (1951), *supra*, 341 U.S. 494 [71 S.Ct. 857, 95 L.Ed. 1137]; *Barsky* v. *United States,* (C.C.A., D.C., 1948), 167 F.2d 241, 247, certiorari denied, 334 U.S. 843 [68 S.Ct. 1511, 92 L.Ed. 1767]; *Galvan* v. *Press* (1953), 347 U.S. 522, 529 [74 S.Ct. 737, 98 L.Ed. 911].) In the Douds case, *supra,* the court pointed out that before enacting the Taft-Hartley Act "Congress had a great mass of material before it which tended to show that Communists and others proscribed by the statute had infiltrated union organizations not to support and further trade union objectives, including the advocacy of change by democratic methods, but to make them a device by which commerce and

industry might be disrupted when the dictates of political policy required such action.'' (P. 389 of 339 U.S.)

Also relevant are the following comments of the court in *Garner* v. *Board of Public Works* (1950), 98 Cal.App.2d 493, 498 [220 P.2d 958], affirmed, (1951), 341 U.S. 716 [71 S.Ct. 909, 95 L.Ed. 1317], in upholding an ordinance requiring a loyalty oath for municipal employes: ''One of the foundation stones of private business is that the employe must be loyal to his employer. Loyalty is implicit in the contract of hiring. No private business can long succeed without the conscientious, undivided support of its employes. The man or woman who denies allegiance to his employment is, and should be, soon separated from it. . . . And, so long as the employment continues, every employer has the right at any time to ask his employe to declare his loyalty.'' To the same effect is the holding in *National Labor Relations Board* v. *International Brotherhood of Electrical Workers* (1953), 346 U.S. 464, 472 [74 S.Ct. 172, 98 L.Ed. 195], ''There is no more elemental cause for discharge of an employee than disloyalty to his employer.'' (See also *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.* (1937), 301 U.S. 1, 45-46 [57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352]; *RKO Radio Pictures, Inc.* v. *Jarrico* (1954), 128 Cal.App.2d 172 [274 P.2d 928].) ▆ From the array of congressional and legislative findings which have been quoted above, if not from the common knowledge of mankind, it must be accepted as conclusively established that a member of the Communist Party cannot be loyal to his private employer as against any directive of his Communist master.

▆ We are of the view, further, that the type of activity engaged in by the employe here—membership in the Communist Party and sustained participation in its activities—is one which as a matter of public policy the company should not be held to have waived by its failure to discharge her earlier than it did. ▆ In the first place, it is an established principle that parties cannot be estopped from relying on defenses based on considerations of public policy, such as illegal contracts. (See *Fewel & Dawes, Inc.* v. *Pratt* (1941), 17 Cal.2d 85, 91 [109 P.2d 650]; *American Nat. Bank* v. *A. G. Sommerville, Inc.* (1923), 191 Cal. 364, 371 [216 P. 376].) ▆ In the second place, the employe's party membership was not shown or even asserted by her to have been an instance of past error but appears, rather, to have been the studied and calculated choice of a person of some intellectual

attainment, and to have been persisted in on an active and devoted basis even at the time of the board hearings. Thus an entirely adequate ground for refusing to employ her (whether by original refusal to hire or by discharge) was a continuing one which was available to the employer at any time during its existence. In this connection it may also be noted that the employer had not only the right to protect itself and its customers against the clear and present danger of continuing a Communist Party member in its employ, but also the duty to take such action as it deemed wise to preserve order in its plant and to protect its other employes, both union and nonunion, against the same danger and the possibility of "sabotage, force, violence and the like." The company properly stated in its notice of discharge, as related above, "The nature of our company's business requires more than the usual precaution against sabotage and subversion. Upon a disclosure that any employe is a member of the Communist Party . . . we conceive it to be the responsibility of management to take action." Knowing the facts which the company knew, it is difficult to conceive of any tenable defense which it could make, or which would be entertained in this court, as against an action for damages in a personal injury or wrongful death case arising from the wilful adulteration of any of its products by Mrs. Walker if it continued her in its employ and she should thereafter take that means of party activity. That acts of sabotage by Communists are reasonably to be expected at any time such acts may be directed by the party leader is not open to question, as has already been shown.

 The fact that the company was not specifically obliged by any governmental regulation to discharge Mrs. Walker affects in nowise its right to do so or the impelling public policy which militates against the order for her reinstatement; in this country, built as it has been upon the initiative and self-reliance of its citizens, the government is expected to step in only where the employer has failed or is unable to act for himself, and he is not obligated to await a governmental decree before taking steps to protect himself or to exercise his right to discharge employes who upon the established facts are dedicated to be disloyal to him, to be likewise disloyal to the American labor union they may purport to serve, and who constitute a continuing risk to both the employing company and the public depending upon the company's products.

This is not the first time that this court has been called upon to recognize and give specific effect to the public policy where its duty in the premises is clear. (See *James* v. *Marinship Corp.* (1944), 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900] ; *Hughes* v. *Superior Court* (1948), 32 Cal.2d 850 [198 P.2d 885], affirmed 339 U.S. 460 [70 S.Ct. 718, 94 L.Ed. 985] ; *Safeway Stores, Inc.* v. *Retail Clerks Intl. Assn.* (1953), 41 Cal.2d 567, 574-575 [261 P.2d 721] ; see also *National Labor Rel. Board* v. *Cincinnati Chem. Wks.* (1944), 144 F.2d 597; *National Labor Relations Board* v. *Kelco Corp.* (1949), 178 F.2d 578.)

 Lastly, in the light of the undisputed evidence and of the specific findings of fact made by the arbitration board, it clearly appears that the conclusional finding that Mrs. Walker was discharged because of her labor union activities is untenable. We have here an exemplification of that which Justice Jackson (in *Dennis* v. *United States* (1941), *supra,* 341 U.S. 494, 564 [71 S.Ct. 857, 95 L.Ed. 1137, 1181]) so clearly envisaged when he said of the Communist Party: "From established policy it tolerates no deviation and no debate. It seeks members that are, or may be secreted in strategic posts in . . . industry . . . and especially in labor unions where it can compel employers to accept and retain its members," and of that to which the court referred when it stated in *American Communications Assn., C.I.O.* v. *Douds* (1950), *supra,* 339 U.S. 382, 389 [70 S.Ct. 674, 94 L.Ed. 925] : "Congress [in enacting the Taft-Hartley Act] had a great mass of material before it which tended to show that Communists and others proscribed by the statute had infiltrated union organizations not to support and further trade union objectives . . . but to make them a device by which commerce and industry might be disrupted . . ." The issue of labor union activity herein is manifestly a false one, a subterfuge injected not to promote the cause of American labor but to further the Communist Party line. Mrs. Walker, as a Communist, was not at any time or in any of her activities truly serving the cause of an American labor union or the interests of an American laboring man; she was but doing the bidding and serving the cause of her foreign master who "tolerates no deviation and no debate." Her activities, therefore, upon any reasonable view of the evidence and the specific findings of fact, were not in truth union labor activities but were Communist Party activities.

Of no small significance in this connection is the fact that

at the arbitration board hearing Mrs. Walker was asked, and she refused to answer the question, "Isn't it a fact, Mrs. Walker . . . that the reason why you sought employment . . . at Cutter Laboratories was because you felt and believed, and had it in mind, that by obtaining that employment at that plant you could more actively and more effectively carry on the program and the activities of the Communist Party?" It is, we think, indisputable that if Mrs. Walker sought and obtained employment at Cutter Laboratories so that she "could more actively and more effectively carry on the program and the activities of the Communist Party," her reinstatement in that employment would serve no cause save that of the Communist conspiracy. The courts of this country by making such an order would be but aiding toward destruction of the government they are sworn to uphold. The contract between Cutter Laboratories and the Bio-Lab Union cannot be construed, and will not be enforced, to protect activities by a Communist on behalf of her party whether in the guise of unionism or otherwise.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with the views herein expressed.

Shenk, J., Edmonds, J., and Spence, J., concurred.

TRAYNOR, J., Dissenting.—All the members of the court agree that we are bound by the determination of the arbitrators* that for two and one-half years Doris Walker's com-

---

*"'While there is a work stoppage and a strike in this collective bargaining history [during Doris Walker's employment], both were directed at wage and contract issues. There is no evidence of any work stoppage, strike or other interference with production, the avowed objective of which was political, philosophical, subversive or revolutionary. . . .

"It is admitted that Doris Walker's conduct and the quality of her work were no different in 1949 from what they were in 1947. It is uncontradicted on the record that all of the essential facts upon which the discharge was based were in existence in 1947 and some years before. And finally, it is established to our satisfaction, by admission of the Company and by proof, that the reasons assigned in 1949 by the Company for the discharge were both known and believed by the Company in 1947.

"This state of the record raises a doubt that the Company ever took the assigned grounds for discharge seriously. . . .

"Finally, it appears, by admission of the Company, that notwithstanding the 1947 investigative report, there was no further investigation until the autumn of 1949. This is inexplicable to us if there was real concern about the combination of Communist Party membership and the omissions and falsifications disclosed by the 1947 investigative report.

"From all of this we are unable to find any satisfactory excuse for

munist affiliations were a matter of indifference to Cutter, that Cutter therefore waived her communist affiliations as a ground for discharging her, that it discharged her solely because of her lawful union activity, and that in doing so it violated its collective bargaining agreement with the Union. (Code Civ. Proc., §§ 1280-1293; *Pacific Vegetable Oil Corp.* v. *C.S.T., Ltd.*, 29 Cal.2d 228, 233 [174 P.2d 441]; *Sapp* v. *Barenfeld*, 34 Cal.2d 515, 523 [212 P.2d 233]; *Crofoot* v. *Blair Holdings Corp.*, 119 Cal.App.2d 156, 185 [260 P.2d 156]; see *Loving & Evans* v. *Blick*, 33 Cal.2d 603, 609 [204 P.2d 23].) It would seem necessarily to follow that we should affirm the judgment of the superior court confirming the award. The majority opinion holds, however, "that an arbitration award which directs that a member of the Communist

---

the Company's delay of over two years in asserting the grounds for discharge presented here. Contract relationships lose effectiveness if grievances about performance are not promptly discussed, settled or brought to an issue. This cuts both ways: unadjusted dissatisfactions of either employer or employees cumulate and exaggerate the importance of ensuing minor dissatisfactions. It seems to us that a commonplace of any 'just' system of discipline is the swift imposition of the penalty upon the heels of discovery of the offense. Under an agreement like this one, an employer should not be entitled to carry mutually known grounds for discharge in his hip pocket indefinitely for future convenient use.

"In view of the foregoing considerations, we find that the grounds asserted by the Company for the discharge were stale. . . .

"The discharge of a top Union official and negotiator at a passionate climax in the middle of a stubbornly contested wage negotiation, standing alone, raises an inference that the discharge is retaliatory in nature and designed to restrain, coerce or interfere with the employee because of lawful Union activity. And we find convincing circumstantial evidence to support this inference.

"Two things that had lain fallow appear to have come to life when the Union opened the agreement for wage adjustment in June of 1949. The Company then put into use a new form of Application for Employment which for the first time asked questions about religion and Communist affiliation. Then also, for the first time in over two years, the Company ordered a fresh investigation into Doris Walker's Communist affiliations.

"The discharge took place in a wave of heat over a radio broadcast and a newspaper advertisement, neither of which was complimentary. But they do not appear to have made any original contribution to the usual exchanges that go on during most wage negotiations.

"While the quality of Doris Walker's conduct and performance on the job remained unchanged for three years, her position of importance in the Union had progressively increased. It was only a few months before the wage negotiation opened that she was elected President of the Local; and she was a member of the Union negotiating committee. . . .

"In view of all of the foregoing considerations, we find that Doris Walker was unjustly discharged, that the reasons assigned by the Company for the discharge were not the real reasons and had been waived, and that the discharge interfered with, restrained and coerced an employee because of participation as an officer and negotiator on behalf of the Union in a wage negotiation."

Party who is dedicated to that party's program of 'sabotage, force, violence and the like' be reinstated to employment in a plant which produces antibiotics used by both the military and civilians is against public policy, as expressed in both federal and state laws, is therefore illegal and void and will not be enforced by the courts." Thus, even though an employer is indifferent to the fact that an employee is a Communist and is therefore no longer free under a collective bargaining contract to discharge him for being a Communist, it can nevertheless violate its contract not to discharge him for lawful union activity and use the fact that he is a Communist as an excuse for its unlawful action. It can do so because this court holds that the employment of a Communist poses such a threat to the security of the country that a contract by an employer with a union to keep a known Communist in·its employ is against public policy and is therefore illegal. *A fortiori* such a contract by an employer with the employee is illegal. Thus by judicial fiat, but without the temerity to declare that Communists are deprived of civil rights (see Civ. Code, § 1556), the court abrogates not only the right of employers and unions to contract for the employment of Communists, but the right of Communists as a class to enter into binding contracts. It does so by invoking public policy in violation of clearly stated policies of the Legislature (Civ. Code, § 1556; Lab. Code, § 923; Code Civ. Proc., §§ 1280-1293) and in a field in which Congress and the Legislature have clearly indicated their competence to deal with the problems involved.

Section 1556 of the Civil Code provides that "All persons are capable of contracting, except minors, persons of unsound mind, and persons deprived of civil rights." (See also 1 Williston on Contracts [rev. ed.] § 222, pp. 669-670.) To deny persons other than those mentioned in this section the right to enter into employment contracts is to repeal *pro tanto* its provisions with respect to the class of contracts of greatest importance to those who must work for a living. Even if this court were at liberty so to repeal the statute, there are compelling reasons why it should not do so.

It is true that in this case only an employment contract is involved. There is nothing in the rationale of the majority opinion, however, that limits its application to such contracts. If it is illegal to employ a Communist, is it illegal to allow a Communist unemployment benefits? If the threat of communist activity makes an employment contract with a known

Communist illegal as against public policy, does it not also invalidate other contracts? Thus, can a landlord break his lease with a Communist on the ground that his building may be sabotaged? Can a buyer refuse to accept and pay for goods purchased from a Communist on the ground that they may contain cleverly concealed defects? Can a seller refuse to deliver goods sold to a Communist on the ground that they may be used to promote communist activities? Can an owner refuse to pay for construction work by a licensed contractor who is a Communist? Indeed, can a Communist be licensed as a contractor? If contracts with Communists are illegal, cannot Communists themselves violate them with impunity?

If breaches of contract can be defended on the ground that one of the parties is a Communist, certainly a hearing will not be denied the alleged Communist on the issue of whether or not he is a Communist. The communist problem, which the court has thus injected into private litigation, may therefore dominate all such litigation and become one of the principal preoccupations of courts. To what end? Certainly private litigation does not lend itself to the formulation of a solution to the problem of what to do with Communists. It is a rash assumption that Congress and the Legislature have been inept in their consideration of the problem, or are incapable of meeting it, or that astride the "unruly horse" of public policy (*National Auto. Ins. Co.* v. *Winter*, 58 Cal.App.2d 11, 22 [136 P.2d 22]) courts are better able to meet it.

It is obvious that Cutter cannot properly invoke public policy on its own behalf. Doris Walker's work was satisfactory and her union activities were consistent with legitimate trade-union objectives. Her presence at Cutter presented at most a threat that she might attempt to use her position for subversive activities. That risk, however, was one that Cutter itself did not consider serious enough to disqualify her for employment, and it has been materially lessened by the fact that her communism has been thoroughly exposed. As an afterthought, Cutter now uses this threat as an excuse not only for discharging her for lawful union activity in violation of its contract, but for attacking an arbitration award that it had agreed should be "final and binding" upon it. By sanctioning these violations of Cutter's contract this court not only defeats the public policy in favor of employee organization free of employer interference and coercion (Lab. Code, § 923; National Labor Relations Act, 29 U.S.C.A. § 151 et seq.) and the public policy in favor of the settlement of

disputes by arbitration (Code Civ. Proc., §§ 1280-1293) but needlessly introduces confusion into a field in which Congress has already undertaken to formulate a workable policy. (50 U.S.C.A. § 781 et seq.)

It is true that there are sensitive areas in which no Communist should be employed. We cannot assume, however, that the security system established by the federal government is not adequate to protect these areas from subversive persons. As the very authorities cited in the majority opinion make clear, neither Congress in enacting subversive control legislation nor the executive department in enforcing it has been insensitive to the nation's security. To date, however, Congress has not seen fit to make mere membership in the Communist Party a crime or to prohibit persons from entering into employment or other contracts with Communists. Similarly, the executive department has not undertaken to prosecute all Communists under the Smith Act. (18 U.S.C.A. § 2385.) It is not the policy of the United States that all Communists are without legal rights and should be interned. So long as they may legally remain at large they should be allowed to earn a living. Even resident enemy aliens, whose activities have not been restricted by Congress or the President, may engage in time of war in ordinary activities and make binding contracts of employment or other contracts. (*Ex parte Kawato*, 317 U.S. 69, 74 [63 S.Ct. 115, 87 L.Ed. 58]; *Heiler* v. *Goodman's Motor Express Van & S. Co.*, 92 N.J. 415 [105 A. 233, 235-236, 3 A.L.R. 336]; *Techt* v. *Hughes*, 229 N.Y. 222, 239 [128 N.E. 185, 11 A.L.R. 166]; *State* v. *Darwin*, 102 Wash. 402 [173 P. 29, 30-31, L.R.A. 1918F 1012].)

It must be obvious that in passing on the validity of ordinary employment contracts in litigation between private parties, courts are in no position effectively to evaluate the security factors that should determine what jobs Communists should or should not hold. In its finding of necessity for the enactment of the Internal Security Act of 1950 (50 U.S.C.A. § 781 et seq.) Congress demonstrated its awareness of the communist problem and specifically established in that act the policy of the United States with respect to the employment of Communists. It did not prohibit all hiring of Communists nor did it leave to the courts the decision as to what jobs Communists might hold. It provided instead that the Secretary of Defense should determine and designate the defense facilities in which members of Communist-action

organizations should not be employed.* Cutter has not been so designated, and we may therefore assume that the employment of a Communist at Cutter poses no threat to the security of the country. I see no evidence of congressional incompetence or of executive negligence in this respect, nor do I see any evidence of superior wisdom, facilities, or techniques available to this court that would justify its intrusion into policy making in this field. It is my opinion that we can still safely leave to the legislative branch of the government the formulation of policies for the security of the country, and I would therefore affirm the judgment.

Gibson, C. J., and Carter, J., concurred.

Respondents' petition for a rehearing was denied February 16, 1955. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.

---

*Section 784(a) of the act provides that "When a Communist organization . . . is registered or there is in effect a final order of the [Subversive Activities Control] Board requiring such organization to register, it shall be unlawful—— (1) For any member of such organization . . . (D) if such organization is a Communist-action organization, to engage in any employment in any defense facility." Section 784(b) provides that "The Secretary of Defense is authorized and directed to designate and proclaim . . . a list of facilities . . . with respect to the operation of which he finds and determines that the security of the United States requires the application of the provisions of subsection (a) of this section."