**SAFEWAY STORES, Appellant,**

v.

**AMERICAN BAKERY AND CONFECTIONERY WORKERS INTERNATIONAL UNION, LOCAL 111, Appellee.**

**No. 24665.**

United States Court of Appeals Fifth Circuit.

Feb. 26, 1968.

Allen Butler, Clark, West, Keller, Clark & Ginsberg, Dallas, Tex., for appellant.

Marvin Menaker, Dallas, Tex., for appellee.

Before BROWN, Chief Judge, and BELL and THORNBERRY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Again in the trilogy [1] fallout we are confronted with enforcement of arbitration agreements in collective bargaining contracts. Here it is not a question of ordering arbitration, for that has taken place. Rather, the question is one of judicial enforcement of the arbiter's decision. The District Court enforced this award in the Union's [2] favor. The Employer,[3] urging basically that the arbiter exceeded his powers by making an erroneous ruling, appeals. We agree with the Trial Court and affirm.

Considering that in dollars all that is at stake is an award of about $63.00 to each of 21 employees—an amount long ago exceeded by the costs of this litigation—we see afresh that "problems which to the outsider seem petty are thought by the adversaries to be matters of great principle, if not principal." United States Gypsum Co. v. United Steelworkers of America, 5 Cir., 1967, 384 F.2d 38, 46, cert. denied, 1968, 389 U.S. 1042, 88 S.Ct. 783, 19 L.Ed.2d 832. The setting and the dispute are here certainly simple.

The Employer's pre-January 1966 practice was for the weekly payroll period to end on Wednesday evening with pay day the next day, Thursday. In January, 1966, it posted a notice stating that the payroll closing date would be changed to Friday and that pay day would be changed to Tuesday. Subsequently, the Employer and the Union met to discuss the proposed changes because the Union thought they were too sudden and would embarrass the employees in the payment of their bills. Thereafter, on February 6, 1966, the Employer, by posted notice,[4] made the chang-

---

1. United Steelworkers of America v. American Mfg. Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf Nav. Co., 1960, 363 U.S. 574, 80 S. Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424, which followed on the icebreaker, Textile Workers Union v. Lincoln Mills of Alabama, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972.

2. American Bakery and Confectionery Workers International Union, Local 111, AFL–CIO.

3. Safeway Stores, Inc.

4. "For your information our proposed payroll closing date change has been postponed until the week/ending of February 18, 1966.

"This postponement has been made so that all employees will have an oppor-

es effective for the week ending Friday, February 18. As stated in the posted notice, on Tuesday, February 22, 1966, the employees were paid for services rendered the preceding Thursday and Friday (February 17 and 18, 1966).

Immediately twenty-one employees signed a grievance protesting the receipt of a check for only two days' pay. The grievance stated:

"Request guaranteed 40 hours pay for week ending February 18, 1966."

It is not disputed that the effect of the grievance was to request pay for 24 hours which were not worked. The arbiter sustained the grievance and ordered the Employer to pay each grievant the difference between his straight time rate for forty hours work and the amount received for the week ending February 18, 1966.

■ In attacking this award the Employer makes a persuasive, though beguiling argument. Lest we come under its spell we think it helpful to emphasize at the outset some basic things. First, there may be in these controversies two distinct problems. One is whether the grievance is arbitrable. The other is whether the award of the arbiter is to be enforced. To order arbitration is not to approve in advance all, or for that matter, any thing that the arbiter does. Especially where unusual difficulties are

indicated courts expressly defer problems of enforcement to post-award proceedings.[5] But in both these situations we must be vigilant that we are not slipping off into that habit, easy for Judges, of "deciding the merits in the guise of adjudicating the court-reserved issue of the scope * * * of the agreement to arbitrate." [6]

■ Nevertheless, there is a role, albeit a very restrictive one, for court review in post-award proceedings. We phrased it in *Hayes* (note 5 supra) this way: "To compel arbitration in the first instance is not to approve *carte blanche* in advance any decision which might be reached. The arbitrator is not a free agent dispensing his own brand of industrial justice. And if the award is arbitrary, capricious or not adequately grounded in the basic collective bargaining contract, it will not be enforced by the courts." 296 F.2d 238, 242–243.[7] This was a reflection of similar trilogy comments: "Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no

tunity to make any necessary arrangements to meet their financial obligations.

"There are several reasons for the payroll date change and we feel it will be to the advantage of the employee as well as the employer.

"1. To give the superintendents more time to figure and check each employee's time card and make necessary corrections.

"2. To correlate our payroll closing date with our four week closing date, etc.

"3. To correlate the closing dates on your group insurance program with that of your group insurance home office closing date.

"On the week of this change will mean that you will receive a check for Thursday and Friday work days on Tuesday afternoon.

"There will be no fixed deductions taken from this two day check. From that day on the pay day will be Tuesday after 12:00 noon for all employees."

5. International Ass'n of Machinists v. Hayes Corp., 5 Cir., 1961, 296 F.2d 238, 244, rehearing denied, 1963, 316 F.2d 90; United States Gypsum Co. v. United Steelworkers of America, supra, 384 F.2d at 48–49 (part IV).

6. United States Gypsum Co. v. United Steelworkers of America, supra, at 49.

7. See also International Brotherhood of Pulp, Sulphite and Paper Mill Workers, Local Union No. 874 v. St. Regis Paper Co., 5 Cir., 1966, 362 F.2d 711.

choice but to refuse enforcement of the award." [8]

■ Here there can be no doubt that the grievance, whatever its merits, was within the agreement to arbitrate.[9] The collective bargaining agreement, as to be expected, dealt in detail with pay, rates, scale, classification, and the like. It also expressly prescribed a minimum day [10] and week.[11] As cast by the grievance the issue was squarely posed whether such provisions (e. g., §§ 8.3 and 8.1) in the light of other undertakings justified the Employer's actions in this payroll period changeover.

■ The Employer's attack on the order of enforcement therefore has to be on the intrinsic merits (or lack of them) of the award. What is the standard of judicial review at that stage? Obviously, it cannot be the ordinary one of ascertaining the correctness on usual principles of law including contract construction. For if this were permissible, arbitration as the structure for industrial peace supplanting the usual processes for court adjudication would itself be supplanted by the judicial machine at the time it would count the most—that is, at the moment an arbiter's award was sought to be enforced.

■ On the other hand, merely because the specific controversy forming the subject of the formal grievance is within the scope of the agreement to arbitrate or the remedy fashioned is like-wise within the contractual powers of the arbiter does not insulate the award from judicial scrutiny altogether. On its face the award should ordinarily reveal that it finds its source in the contract and those circumstances out of which comes the "common law of the shop." United Steelworkers of America v. Warrior & Gulf Nav. Co., supra, 363 U.S. at 580, 80 S.Ct. at 1351, 4 L.Ed.2d at 1416; Dallas Typographical Union, No. 173 v. A. H. Belo Corp., 5 Cir., 1967, 372 F.2d 577, 579. But when it reasonably satisfies these requirements we think it is not open to the court to assay the legal correctness of the reasoning pursued.[12] Arbiters, as do Judges, can err. And the policy of the law (see note 1 supra), committing awesome questions of great intricacy and difficulty to lay persons who need not be and frequently are not, even lawyers, has to reckon with the likelihood that the chance—and gravity —of error will be greater, not less, than with traditional judicial processes. We may assume, without here deciding, that if the reasoning is so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling then the Court can strike down the award.[13] But where it is not that gross the arbiter's error—even though on an issue on which the reviewing court would have arrived at a different decision does not ipso facto make the arbiter an outlaw or his erroneous action a matter outside the scope of the agreement to

8. United Steelworkers of America v. Enterprise Wheel & Car Corp., supra, 363 U.S. at 597, 80 S.Ct. at 1361, 4 L.Ed.2d at 1428.

9. "Section 14.1 * * * Grievances shall consist of disputes arising between the Employer and the Union and/or employee concerning the interpretation and application of the provisions of this Agreement. * * * "

10. "Section 8.1 Minimum Day. Employees called to work shall be given sufficient work to enable them to earn not less than six (6) times the applicable hourly rate of pay, or not being given that much work, shall receive six (6) hours pay at the applicable hourly rate, except in case production ceases due to an 'act of God.' "

11. "Section 8.3 Minimum Week. Each full time employee who reports for the regular assignments as required by his department's schedule is guaranteed pay for such week equivalent to not less than forty (40) hours worked in six (6) days or less at the employee's regular straight time rate of pay. If it becomes necessary to reduce the working force because of a reduction in production, the Employer may change the status of a full time employee to that of a part time employee."

12. See Kroger Co. v. International Brotherhood of Teamsters, etc. Local No. 661, 6 Cir., 1967, 380 F.2d 728, 732.

13. Cf. John Wiley & Sons, Inc. v. Livingston, 1964, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898.

arbitrate, in excess of the terms of the submission or beyond his powers as an arbiter.

We emphasize again and again, as we have before, Dallas Typographical Union, No. 173 v. A. H. Belo Corp., supra, at 581; Boeing Co. v. International Ass'n of Machinists etc., 5 Cir., 1967, 381 F.2d 119, that cases of the type pressed so heavily on us by the Employer [14] must not be read to justify the court resuming its traditional role of assaying the judicial acceptability of the award had it been a court judgment.

■ As these admonitions are addressed primarily to ourselves as Judges on the trial and appellate fronts we should heed them by resisting the temptation to "reason out" a la judges the arbiter's

award to see if it passes muster. So it is here. But even under these self-imposed wraps this award shows on its face two things. First, the arbiter was drawing on the collective bargaining agreement as the source both of the dispute and its solution. Second, the award put forward a passably plausible —even if perhaps erroneous—analysis of the interplay of the contractual wage-minimum-day-week provisions, especially in the light of the Employer's long practice of wage payment to the very eve of payment day with no withholding of earned wages.[15]

■ If such a result is unpalatable to an employer or his law-trained counsel who feels he had a hands-down certainty in a law court, it must be remembered

14. The Employer urges: Torrington Co. v. Metal Products Workers etc., 2 Cir., 1966, 362 F.2d 677; Textile Workers Union of America etc. v. American Thread Co., 4 Cir., 1961, 291 F.2d 894; Kansas City Luggage & Novelty Workers Union v. Neevell Luggage Mfg. Co., 8 Cir., 1964, 325 F.2d 992; Local 791, International Union of Electrical, Radio & Machine Workers v. Magnavox Co., 6 Cir., 1961, 286 F.2d 465; Central Packing Co. v. United Packinghouse Workers of America, D.Kan., 1961, 195 F.Supp. 188; H. K. Porter Co. v. United Saw, File & Steel Products Workers, 3 Cir., 1964, 333 F.2d 596; Truck Drivers & Helpers Union, Local 784 v. Ulry-Talbert Co., 8 Cir., 1964, 330 F.2d 562.

15. After referring to §§ 8.1 and 8.3 (notes 10 and 11 supra) the award continued: "Under the old plan, the Company withheld little or no pay; that is, on the Thursday morning (or Wednesday evening) pay day, employees were paid for their work including Wednesday; they were paid 'up to the minute'. Under the new plan, employees on each Tuesday pay day are not paid past the preceding Friday,—though they have worked the intervening Saturday, Sunday and Monday also. Their pay for those three days is withheld till the next Tuesday; and the employee won't be paid 'up to the minute' until final settlement when his employment ceases. * * *

"The Section says that each employee 'is guaranteed pay' for at least 40 hours each week. The real issue is, do the three quoted words mean, a guaranty that the employee will *earn* that much pay,

though part of it may be paid a little later—or do the words mean, a guaranty that he will *get a check* for that amount? Under the Company argument, he earns that much, but does not get paid all of it, for *the first week* of the new plan. (Here, employees got only two days' pay on the change-over pay day,—though thereafter they always received the customary full pay). However, it seems almost certain that the parties negotiating the section, knowing how most of us have house payments, car payments. appliance payments, and current bills, must have intended to guarantee not only the earning of 40 hours' pay each week, but the *payment* of it each week. Guaranteeing pay for reporting through the week, according to posted schedule, would mean to the employees,—and management would understand and anticipate that meaning, —that they would get a pay check for that week, for the guaranteed amount.

"This interpretation is corroborated by the practice prior to the February change. The pay period ended on Wednesday, and payment for work through Wednesday was paid that same evening or the next morning; that is, as close as practicable to paying all that had been earned before the pay day. (In fact, such payment apparently came too soon after the end of the pay period to be fully practicable; hence the change).

"Thus the section seems to mean that each week there are to be pay checks for at least the 40 hours' pay; hence the grievance must be sustained." (Emphasis in original.)

84

that just such a likelihood is the by-product of a consensually adopted contract arrangement—a mechanism that can hold for, as well as against, the employer [16] even to the point of outlawing labor's precious right to strike. New Orleans S.S. Ass'n v. General Longshore Workers, Local 1418, 5 Cir., 1968, 389 F. 2d 369 [Jan. 26, 1968].

The arbiter was chosen to be the Judge. That Judge has spoken. There it ends.

Affirmed.

16. See, e.g., International Brotherhood of Pulp, Sulphite and Paper Mill Workers, Local Union No. 874 v. St. Regis Paper Co., note 7 supra.