[Civ. No. 37297. First Dist., Div. Three. June 25, 1976.]

AMERICAN AND NATIONAL LEAGUES OF PROFESSIONAL
BASEBALL CLUBS, Plaintiff and Appellant, v.
MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION,
Defendant and Respondent.

494

**COUNSEL**

Iverson, Yoakum, Papiano & Hatch, Neil Papiano, Dennis A. Page, Donald M. Robbins and John A. Slezak for Plaintiff and Appellant.

Neyhart, Anderson & Freitas, Neyhart & Anderson, Jerome M. Garchik, Peter Nussbaum and Richard M. Moss for Defendant and Respondent.

**OPINION**

**DRAPER, P. J.**—This is an appeal by Oakland Athletics, Division of Charles O. Finley & Co., Inc., from a judgment denying its petition to vacate an arbitration award in favor of James A. Hunter.[1]

Hunter, a pitcher, contracted to play baseball for the appellant for the 1974 and 1975 seasons. The contract, dated February 11, 1974, required

---

[1]The caption of the case "American and National Leagues of Professional Baseball Clubs (Oakland Athletics, Division of Charles O. Finley and Co., Inc.)" is misleading. The American and National Leagues and their constituent clubs are not a party to this appeal and took no action to vacate the arbitrators' award. The parties to the petition and appeal are the Oakland Athletics, a Division of Charles O. Finley and Co., Inc., petitioner and appellant, and the Major League Baseball Players Association, the sole and exclusive collective bargaining agent for all major league baseball players and for James A. "Catfish" Hunter, a major league baseball player, respondent.

payment to the player of $100,000 for each of the two seasons. A "special covenant" included in the agreement provided: ". . . the said Club will pay to any person, firm or corporation designated by said Player, the sum of Fifty Thousand ($50,000.00) Dollars, per year, for the duration of this contract to be deferred compensation, same to be paid during the seasons as earned." As proposed by Hunter's attorney, the last line had required the deferred compensation to be paid "at any time requested by said Player," but at the request of appellant's president, Charles O. Finley, these words had been stricken, and "during the seasons as earned" had been substituted. Four days after the contract date, Finley wrote to Hunter's attorney that the club "will be very happy to cooperate in any manner possible to defer any amount of Mr. Hunter's compensation" and "after you have decided as to how these payments should be made and who they should be made to, kindly advise us and we will cooperate accordingly."

Hunter's attorney corresponded with the Internal Revenue Service and ultimately submitted to it an agreement for deferred compensation investment account (DCIA), proposed to be executed by player and club. It provided that the value of that account be "deemed equal to the amount of the account if the deferred compensation had been invested" in annuity contracts with a named life insurance company, half in a fixed annuity contract and half in a variable annuity. This proposed agreement specifically provided "The Employer has the discretion. . . to invest or not invest" and "nothing contained in this agreement shall be construed as requiring such investment." On July 15, the Internal Revenue Service wrote Hunter, in care of his attorney, that "if payments are made according to its terms . . . the amounts payable under the Agreement will not be includible in gross income until such time as those amounts are paid or otherwise made available . . . to you or your beneficiary." On August 1, Hunter delivered to Finley an agreement in the above form, together with form of application to the named life insurance company for annuity contracts. The agreement and the application for annuity contracts provided that ownership of the annuities was to be vested in the club, and not Hunter.

On August 8, Hunter's attorney wrote Finley that the papers delivered by Hunter to Finley had not been signed and returned. He demanded prompt action. Some time before August 22, Finley telephoned Hunter's attorney to say that due to domestic difficulties Finley might be unable to secure the signature of Mrs. Finley, the secretary of the club. The

attorney wrote Finley, August 22, again seeking signature and return of the papers. On September 4, Finley phoned to inform the attorney that he feared other players might seek what Hunter wanted, that other club owners had urged him not to sign, and that if he did sign he [Finley] would have to pay additional taxes. Following another letter, Finley phoned the attorney on September 15 and, for the first time, stated that he would not sign as requested, nor would he pay the insurer. The attorney asked for a letter to that effect, but Finley refused, saying that he had thrown the papers away. The next day, Hunter's attorney informed Finley that "we contend . . . you have breached your contract." and formally demanded signature of the DCIA agreement and payment of $50,000 to the life insurance company. On October 4, general counsel for the Major League Baseball Players Association telegraphed Finley on behalf of Hunter, asserting termination of the contract for breach and for failure to cure the breach within 10 days. On October 17 and 18, the association filed grievances with the club owners' Player Relations Committee, one seeking to have Hunter declared a "free agent" and the other seeking payment of the $50,000 deferred compensation for the 1974 season.

The arbitration panel sustained the player's position as to both grievances and made awards accordingly. Appellant club petitioned the superior court for vacation of the award. The petition was denied and the awards affirmed. The club appeals.

It is undisputed that the club agreed to pay Hunter $100,000 per season. Of this amount, $50,000 per year was to be "deferred compensation" but was specifically to be paid to player's designee, "during the seasons as earned." It is equally undisputed that no part of the deferred compensation was in fact paid, despite demands therefor beginning August 1. As a result, the club enjoyed Hunter's not insubstantial services for the full 1974 season at a cost of but half the agreed total compensation.

It is quite true that the club's purchase of annuity contracts in August was not required by the DCIA agreement proposed by Hunter's attorney, and that this inconsistency might result in loss to Hunter of the tax benefit he sought by attempting to defer taxation of his income to years of lesser earnings. But, as the arbitration panel properly found from the documents and the testimony as to negotiations for the basic contract,

the plan was designed to benefit Hunter, and not the club. Hence its success or failure was a matter for consideration by Hunter only.

Appellant club, however, asserts that its signature of the DCIA agreement and simultaneous payment to the life insurer would be illegal, and would subject the club and Finley to prosecution for aiding or assisting in a false statement in a matter arising under the internal revenue laws (26 U.S.C.A. § 7206). But the club had made no representation that it would comply only with the DCIA agreement, and it would have been a minimal inconvenience, if it executed the documents delivered to it August 1, to disclose to the Internal Revenue Service both the DCIA agreement and the payments to the life insurer.

Aside from the effect upon appellant, however, it is argued that the award is illegal or against public policy. It must be remembered that we deal here with an arbitration award. Grounds for vacation of an arbitration are strictly limited by statute (Code Civ. Proc., § 1286.2). ▪ Moreover, "erroneous reasoning will not invalidate an otherwise proper award." ▪ Every intendment of validity must be given the award and doubts must be resolved in its favor. (*Grunwald-Marx, Inc.* v. *L. A. Joint Board,* 52 Cal.2d 568, 589 [343 P.2d 23].)

Nonetheless, arbitration awards have been vacated when they are illegal or against public policy. Hence we examine briefly the several types of decisions so holding. ▪ Of course, if the underlying contract which provides for arbitration is itself illegal, no arbitration award may be made under it. (*Loving & Evans* v. *Blick,* 33 Cal.2d 603 [204 P.2d 23] [construction contract by unlicensed contractor].) *Loving* has no application here, since the basic player agreement is concededly valid. ▪ Similarly, if the award commands an act which is unlawful or against public policy, it will be vacated. (*Black* v. *Cutter Laboratories,* 43 Cal.2d 788 [278 P.2d 905].) Such authorities have no application here, since the award commands only payment of the unpaid compensation of $50,000.

▪ Appellant, however, seems to argue that the claimed breach consisted only in its refusal to perform acts which would have violated public policy by encouraging tax evasion. He contends that thus, while neither the basic agreement nor the award itself is illegal, the award nonetheless is against public policy. As we have pointed out, both statutory and judicial policy favor finality of arbitration awards.

Moreover, courts are reluctant to declare a contract void as against public policy, and will refuse to do so if by any reasonable construction it may be upheld. (*Vick* v. *Patterson,* 158 Cal.App.2d 414, 417 [322 P.2d 548].)

Most importantly, appellant's contention is rejected under a recent Supreme Court holding. (*Redke* v. *Silvertrust,* 6 Cal.3d 94 [98 Cal.Rptr. 293, 490 P.2d 805], cert. den., 405 U.S. 1041 [31 L.Ed.2d 583, 92 S.Ct. 1316].) There, an *inter vivos* trust and agreement between husband and wife for testamentary disposition were attacked as working a fraud upon tax authorities and thus unenforceable. There, as here, there was "nothing illegal per se" in the agreement, for it "could have been carried out in an entirely legal manner had [the husband] disclosed its existence to the tax authorities, or chosen not to claim the . . . deduction." (P. 102.) ■ "As a general rule, if a contract can be performed legally, a court will presume that the parties intended a lawful mode of performance" (*id.*). Absent proof that the parties entered the agreement "with the intent of fraudulently concealing its existence from the tax authorities," the agreement was valid and enforceable.

In *Redke,* the surviving husband had in fact claimed and secured the questionable tax deduction. ■ Here, no tax benefit has been claimed, much less been allowed. The inconsistency of the proposed DCIA and the proposed annuity purchase might have given rise to an inference of intent by Hunter's attorney to evade taxes, although there was testimony by a qualified tax expert that the proposal was proper. The arbitrators, however, did not draw the inference urged by appellant. The inconsistency could as well have been inferred to arise from confusion or ineptitude of Hunter's counsel. Moreover, as the arbitrators found, no such issue of illegality was raised by Finley in his objections to signing the two proposed documents. Rather, it was held reasonably inferable that the club refused to comply with Hunter's request only because Finley belatedly recognized that the language added by him to the basic contract, requiring payment of the deferred compensation "during the seasons as earned" deprived him of the right to retain the funds for use of the club until their actual receipt by Hunter.

Appellant also attacks that portion of the award which declared Hunter a "free agent." He asserts that application of the "reserve clause" is not subject to arbitration. The argument involves construction of the major league rules, the basic agreement between owners and players

groups, and the uniform players contract. The issue is discussed at length in a recent decision (*Kansas City Royals Baseball Corp.* v. *Major League Baseball Players Assn.* (8th Cir. 1976) 532 F.2d 615). We accept the reasoning and conclusion of that decision, which affirmed an arbitration award comparable to that before us.

Judgment affirmed.

Emerson, J.,* concurred.

**BROWN (H. C.), J.**—I dissent.

The affirmance of the arbitration award, in my opinion, is placing the court's stamp of approval on a declaration that Finley should have signed an agreement despite its recognizable illegal objectives. I believe the arbitration award should be vacated because the arbitrators failed to recognize this illegality and for the further reason that the penalty assessed against Finley by the arbitrators, i.e., declaring Hunter to be a free agent, constituted an irrational award.

The case of *Redke* v. *Silvertrust* (1971) 6 Cal.3d 94 [98 Cal.Rptr. 293, 490 P.2d 805], relied upon by the majority, does not suggest differently. In *Redke,* a husband, Sam, made an oral agreement with his dying wife, Ann, that he would leave the wife's money, which she had willed to him, to the wife's only surviving child, Mitzi. Sam, however, did not carry out his promise and left the money to a new wife and his natural children. Mitzi sought to enforce the oral agreement between Sam and Ann and was met with the objection that the oral agreement was not disclosed to the taxing authorities and that Sam had thereby improperly obtained a marital tax deduction. The Supreme Court reasonably found that the oral agreement was not illegal in itself and that there was sufficient evidence that Sam and Ann did not have an intent to defraud the taxing authorities when they entered the agreement. Furthermore, the court noted that even if the law would not enforce an illegal contract in favor of the wrongdoers, it might in favor of an innocent party. As will be discussed below, the performance sought by Hunter was, if not illegal, at least against public policy and the decision, in this case, aids the wrongdoers.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

Finley did not refuse to pay Hunter his salary, nor did he refuse to pay one-half of that salary in "deferred compensation." The sole dispute presented to the arbitrators related to the form of the deferred compensation agreement. The repudiation by Finley pertained only to a specific plan proposed by Hunter.

The plan proposed by Hunter required the performance of two acts by Finley, the execution of the Deferred Compensation Investment Agreement (DCIA) and the purchase of an annuity contract issued by Jefferson Standard Life Insurance Company. The DCIA provided that Finley would hold the $50,000 deferred compensation in an account which would be valued as if it had been invested in annuity contracts issued by the Jefferson Standard Life Insurance Company. The DCIA, however, very plainly provided that Finley had complete discretion as to whether or not he invested the fund and how he invested it.[1]

Hunter's attorney obtained a ruling from the IRS that Hunter would be entitled to income tax deferral on the $50,000 *if* the money was held "strictly in accordance" with the DCIA plan.[2] Following the ruling by

---

[1] The pertinent parts of the DCIA read as follows:

"**3. DEFERRED FUNDS TO REMAIN AN ASSET OF EMPLOYER**

Upon execution of this agreement by the parties hereto the EMPLOYER shall establish the DCIA so as to provide a convenient accounting method for measuring the EMPLOYER'S obligations to the EMPLOYEE under this agreement. *The* EMPLOYER *shall have the discretion to segregate or not to segregate, and invest or not invest, all or any portion of the amount credited to the DCIA; nothing contained in this agreement shall be construed as requiring such investment. . . ."*

"**4. VALUATION OF DCIA**

The value of the DCIA shall at all times be deemed equal to the amount which would have been in the DCIA had the money credited to the DCIA been invested in the manner set forth in Schedule A attached; and all benefits under this agreement shall be calculated on that basis. *The* EMPLOYER, *however, shall not be obligated to invest the amount credited to the DCIA in such manner but instead shall be free to invest or not to invest the amount in any manner in which it sees fit.*"

"SCHEDULE A. It is mutually agreed between the undersigned parties that the value of the DCIA shall be equal to the amounts which *would have existed had the agreed upon amount* of Deferred Compensation *been invested* as follows:

"50% invested in a fixed annuity contract issued by Jefferson Standard Life Insurance Company

"50% invested in a variable annuity contract issued by Jefferson Standard Life Insurance Company" (Italics added.)

[2] The letter of approval of the plan from the IRS reads in relevant part as follows:

"Dear Mr. Hunter:

This is in reply to a letter dated June 25, 1974, and prior correspondence dated May 9, 1974 and March 21, 1974, submitted on your behalf by Mr. J. Carlton Cherry, requesting a ruling concerning the Federal income tax consequences of a deferred compensation

the IRS, Hunter's counsel forwarded to Finley a copy of the IRS ruling, a copy of the DCIA *and an application for a $50,000 annuity policy in the Jefferson Standard Life Insurance Company*. Finley was directed to execute both the agreement and the annuity application on behalf of the Oakland A's and to return the signed documents to Hunter's counsel. When Finley failed to execute the documents as presented, Hunter's attorney on October 4, 1974, wired a notice of termination of the contract.

When the dispute reached arbitration, Finley took the position that he had not intended to make an agreement to pay deferred compensation in an amount greater than $50,000, the ultimate result of Hunter's proposals, and that the employment contract did not so require. He also took the position that Hunter's requirement that he sign the DCIA *and* purchase the annuity was "an improper effort to have it both ways."[3] Finley then urged that, if the arbitrators held against him on the issue under dispute, he be allowed to comply with the performance demanded by Hunter and approved by the arbitrators.

---

agreement ('Agreement') which you proposed to enter into with your employer, the Oakland Athletics Division of Charles O. Finley and Co., Inc. The terms of the Agreement as amended and submitted with Mr. Cherry's correspondence of June 25, 1974, as well as all other pertinent facts contained in the June 25th and previous correspondence are incorporated herein by reference.

*Based solely on the information and documents submitted, it is held that if payments are made strictly in accordance with the terms of the Plan as amended,* and if you report your income on the cash receipts and disbursements method of accounting, *the amounts payable under the Agreement will not be includible in gross income until such time as those amounts are paid or otherwise made available, whichever is earlier, to you or your beneficiary.*

A copy of this ruling should be attached to your tax return for the taxable year in which the deferred compensation agreement was executed. We are enclosing a copy for that purpose." (Italics added.)

[3]In a letter to the arbitrators Finley stated that he was being asked to agree to an arrangement "which was both objectionable and beyond my understanding in two respects" as follows:

"First, I had merely agreed to defer payment of $50,000 until some unspecified future time, at which time I would make payment as directed. I never agreed to pay more than $50,000 at any time and therefore I was not agreeable, once I understood the proposal, to paying $50,000 plus the result of a 'phantom' investment increment.

"Second, I objected to the idea of receiving a proposed agreement which said that the actual investment of the $50,000 would be left to the Club while at the same time receiving an entirely inconsistent demand that a specific investment be made. My tax advisers tell me that the latter demand is inconsistent with a proper deferral arrangement—expressed in the draft agreement—and is an improper effort to have it both ways. I remain ready to defer, as I have, the $50,000 originally agreed to and to pay that amount at some subsequent date as directed by Mr. Hunter. Or if Mr. Hunter

The arbitrators held that the performance demanded by Hunter was proper under the contract. I do not agree.

I recognize the rules relating to the finality of awards of arbitration and would not under these rules disturb the decision of the arbitrators that Finley was bound to pay the deferred compensation under a plan where Hunter rather than Finley would realize the income during the deferral period. An exception to the rules of reviewing arbitration awards is made, however, where the issue is illegality.

An arbitration award founded on an illegal contract or directing the performance of an illegal act must be vacated by the trial court; this principle applies to awards which violate public policy. (*Black* v. *Cutter Laboratories* (1955) 43 Cal.2d 788, 798-799 [278 P.2d 905]; *Loving & Evans* v. *Blick* (1949) 33 Cal.2d 603, 611 [204 P.2d 23].) Although the question of illegality is one which may be considered by the arbitrators (*California State Council of Carpenters* v. *Superior Court* (1970) 11 Cal.App.3d 144, 162-163 [89 Cal.Rptr. 625]), the usual deference given to the decisions of arbitrators is not given to its conclusions that a contract involves no illegality. (*Loving & Evans* v. *Blick, supra,* at p. 609.)

The majority is correct in pointing out that none of the cases above cited deals with the question of illegality in the context it reaches us here. I see no reason to apply a different rule. The arbitrators may not aid the party making the demand for illegal performance by either directing the illegal act or rescinding the contract for failure to perform the illegal act.

The illegality in the instant case results from the requirement that Finley both sign the DCIA and purchase the annuity. By signing the DCIA, appellant would specifically agree to an arrangement whereby it would have discretion *not* to buy an annuity contract issued by Jefferson Standard Life Insurance Company. At the same time, it was required to *buy* the annuity, indicating the falsity of the statement in the DCIA. The DCIA was prepared in conformity with the requirements for tax treatment of deferred income and after a favorable IRS ruling had been received approving the plan as qualified for the desired tax treatment. If

---

prefers, I will pay the $50,000 now as directed but such a payment would of course be current, not deferred compensation.

"The dispute . . . is the product of Mr. Cherry's efforts to introduce new terms to our understanding and to construct an internally inconsistent arrangement of extremely dubious tax propriety."

filed with the IRS, it would be a false statement, the only conceivable purpose of which would be to support Mr. Hunter's characterization of the $50,000 compensation as deferred income. Such filing could conceivably subject Mr. Hunter to penalties for making a false statement and Mr. Finley to penalties for aiding in the making of a false statement. (26 U.S.C. § 7206.)

Appellant analogizes the situation to that in which courts have considered the falsification of ownership of winning horse-racing tickets under title 26 of United States Code, section 7206, subdivision (2). In the horse-racing situation, owners of the winning tickets would pay a commission to someone to represent himself as the winner on the necessary forms and return the proceeds to the winners. (See *United States* v. *Kessler* (2d Cir. 1971) 449 F.2d 1315; *United States* v. *Salerno* (M.D.Pa. 1971) 330 F.Supp. 1401; *United States* v. *Green* (2d Cir. 1970) 421 F.2d 1237.) The cashiers of the winning tickets were liable under title 26 of United States Code, section 7206, subdivision (2). Their culpability arose from their knowledge that they were not the owners of the tickets and from their willful misrepresentation on documents presented to the IRS and used by that agency for the purpose of ascertaining individual tax liability that they were the owners thereof. The basic situation here differs only in the fact that the DCIA had not yet been filed as a supporting document on Mr. Hunter's tax return. If Hunter did not file the DCIA with the IRS, no illegal action would have occurred but it cannot be argued that public policy approves the execution of papers attesting to the existence of a nonexisting plan. Finley could hardly be required to make a false statement and then rely on Hunter to have second thoughts regarding filing the DCIA.

At the arbitration hearing an expert witness testified that, in his opinion, deferred income tax treatment would be available even if the employee designated the investment. He stated that he didn't know if the IRS would issue a ruling to that effect. This is not persuasive. It indicates that Finley by signing would be "buying" a future lawsuit or defending one.

Also, it misses the point of the impropriety. Hunter could have required Finley to execute a plan wherein Hunter designated the investment or a plan wherein Finley had discretion. The impropriety is in falsely stating that one plan existed and then carrying out the other.

The majority opinion suggests that Finley should have signed the DCIA and the application for the annuity and that it would only be of "minimal inconvenience" to Finley to disclose to the IRS that he had signed both documents. Apparently the court refuses to assume Hunter had illegal intentions as far as tax fraud is concerned but expects Finley to assume the contrary. Furthermore, this does not solve the basic flaw, the requirement that Finley sign a false statement, the DCIA, to avoid being in breach of his agreement.

The arbitrators found that Finley refused to sign the documents because they were not to his advantage. The motive of Finley is irrelevant however. If the performance demanded is illegal, it does not matter that performance is in reality refused for other reasons. Thus, in *Loving & Evans* v. *Blick, supra,* the plaintiff refused to honor a contractor's demands because he disputed the amount. The merits of his reasons for dishonoring the contract, however, did not affect the fact that the arbitration award could not be enforced because of the fact that the contractor was not properly licensed.

In *Black* v. *Cutter Laboratories, supra,* at pages 798-799, the court held that an arbitration award that orders action against public policy will not be enforced by the courts. To require Finley to sign an agreement containing false statements conforming to an IRS ruling does not conform to public policy which favors a complete and candid disclosure of information relevant to the taxing procedures through which our society is financed. If the courts cannot require the act to be done, they cannot use the act as a ground for rescission or damages, the contract remedy for breach in the instant case.

I also cannot agree with the declaration of the arbitrators that Hunter was entitled to terminate the contract and become a free agent. Such a remedy is not in keeping with the purposes of arbitration and imposed a severe penalty on Finley for disputing a provision in the contract. I would conclude that the award is an irrational one.

I am aware of the numerous authorities holding that every intendment will be indulged in to give effect to an arbitration award and when that award is made upon unqualified submission, the findings of the arbitrators on questions of both law and the facts are conclusive and may not be reviewed by the courts unless we can say "that the arbitrators gave

a completely irrational construction to the provisions in dispute" (see *Jones* v. *Kvistad* (1971) 19 Cal.App.3d 836, 840 [97 Cal.Rptr. 100]), or that it is illegal.

While recognizing the wide range of authority of arbitrators and the finality of their decision, it should be equally recognized that an award without foundation of reason or fact is equated with an award that exceeds the authority of jurisdiction of the Arbitration Board.

"To compel arbitration in the first instance is not to approve *carte blanche* in advance any decision which might be reached" by the arbitrators. "The arbitrator is not a free agent dispensing his own brand of industrial justice." (*International Ass'n of Machinists* v. *Hayes Corporation* (5th Cir. 1961) 296 F.2d 238, 242.)

Also, I am aware of the language in numerous cases to the effect that " 'arbitrators may be said to have [exceeded their powers] only if they gave a completely irrational construction to the provisions in dispute.' " (See *Lesser Towers, Inc.* v. *Roscoe-Ajax Constr. Co.* (1969) 271 Cal.App.2d 675, 701 [77 Cal.Rptr. 100]; *Jones* v. *Kvistad, supra,* 19 Cal.App.3d at p. 843.) In *Safeway Stores* v. *American Bakery & Con. W. I. U., Local 111* (5th Cir. 1968) 390 F.2d 79, 82, the court defines an arbitrary, capricious or irrational award: "We may assume, without here deciding, that if the reasoning is so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling then the Court can strike down the award." (See also 18E Kheel, Labor Law, § 24.05(2).

In brief, despite the extensive and authoritative power of arbitrators, their decision is not wholly insulated from judicial scrutiny. (*Steelworkers* v. *Enterprise Corp.* (1960) 363 U.S. 593, 597 [4 L.Ed.2d 1424, 1428, 80 S.Ct. 1358]; *Oestereich* v. *Selective Service Bd.* (1968) 393 U.S. 233 [21 L.Ed.2d 402, 89 S.Ct. 414]; 390 F.2d 79, 81, 82.)

The dispute between Hunter and Finley related solely to the type of deferred salary plan to be adopted. Finley conceded (1) that Hunter's salary was to be $100,000 per year for the 1974 and 1975 seasons; (2) that $50,000 of each year's salary was to be deferred for the obvious purpose of Hunter availing himself of permissible income tax benefits under IRS regulations.

It is also observed that the deferral provision in the original salary agreement between the Oakland A's and Hunter contained serious omissions, i.e., whether it should be held by the Oakland A's, how its ultimate payments should be secured, when was it to be paid to Hunter, was it to be invested, who was to receive the benefits of the investment, etc.? Its very brevity implied that a more. detailed salary deferral agreement would be forthcoming to provide for the voids in the agreement.

At the hearing before the arbitrators, Finley requested that he be allowed to comply with the deferral plan submitted by Hunter if the arbitrators decided that Finley was incorrect in his interpretation of his rights under the salary agreement.[4] It is clear that a bona fide dispute existed between the parties relative to the ambiguous and unclear provision contained in the salary agreement. It is my opinion that Finley had the simple right of contesting the interpretation of that provision without subjecting himself to the loss of a valuable player.

It would appear obvious that reasonable minds could differ as to the type of deferred agreement that Finley was obligated to supply. The arbitrators could accept the interpretation of Hunter. It could compel compliance by Finley. Here, the arbitration award denied Finley's right to dispute Hunter's interpretation of the deferral clause and penalized him for asserting that right by declaring Hunter a free agent. Such a position, if sustained, would put the owners at the mercy of the players for an owner could never risk a decision unfavorable to himself by an arbitrator immune in large part from the scrutiny of the courts.

Here, Hunter suffered no irreparable damage by reason of the dispute. The arbitrators could interpret the provisions for deferring the salary as requiring an investment with the profit to be Hunter's. The amount the investment may have earned, if the investment had been made immediately, was only a matter of mathematical computation.

---

[4]At the arbitration hearing Finley's counsel stated in part:

"MR. RONA: The Club has taken the position that they don't believe they have the obligation to purchase any annuity. They do not want to. There has been no attempt to deprive Mr. Hunter of the $50,000, but we have a disagreement as to how that $50,000 is to be deferred.

"If Mr. Hunter is right and the Club must sign the deferred compensation agreement, Joint Exhibit 4A, and/or purchase an annuity, they, obviously, will comply with any decision of the panel, and Mr. Hunter will have his deferred compensation. if that is the award of the panel, ..."

It is true that Finley could have also demanded arbitration as to the type of deferral plan required. It is apparent that in the event Finley had made such a demand the arbitrators could not reasonably declare the contract terminated even after a decision adverse to Finley's views. The function of the arbitrators is to resolve a bona fide dispute, not impose a punitive award. A harsh and unnecessary award, in my opinion, should be equated with an irrational award and be vacated. While Hunter initiated the grievance procedure and asked for the arbitration, it would seem that the same reasoning would apply no matter which party sought the arbitration.

Termination of valuable contract rights should not depend upon which party gets to the arbitrators first. The proper procedure, in my opinion, in a wage dispute such as this, would be the resolution of the disputed issue by the arbitrators after which the contract should not be terminated unless there was a refusal to abide by the decision of the arbitrators.

It appears inconceivable and unwarranted for the arbitrators to declare the contract terminated and make Hunter a free agent under the facts before us without affording the Oakland A's the right to comply with the arbitrators' determination.

On the basis that the arbitration award would compel an illegal act on the part of Finley and that the award in declaring Hunter a free agent is an irrational act, I would vacate the award.

Appellant's petition for a hearing by the Supreme Court was denied August 18, 1976.