557 F.2d 521
 96 L.R.R.M. (BNA) 2006, 82 Lab.Cas. P 10,068
 Russell WALTERS et al., Individually and as representatives
of the class composed of relay drivers of Roadway
Express, Inc.,
Plaintiffs-Appellants-Cross Appellees,
v.
ROADWAY EXPRESS, INC., et al., Defendants-Appellees-Cross Appellants.
 No. 75-2748.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 12, 1977.
Rehearing and Rehearing En Banc Denied Oct. 21, 1977.
 
 Dixon L. Pyles, Jackson, Miss., for plaintiffs-appellants-cross appellees.
 David H. Nutt, Chas. R. Davis, Jackson, Miss., for defendants-appellees-cross appellants.
 Fountain D. Dawson, Greenville, Miss., for Local 891, Teamsters, Inc., et al.
 Simrall, Aultman & Pope, Hattiesburg, Miss., Edward C. Kaminski, Akron, Ohio, for Roadway Exp. Inc.
 Moran M. Pope, Jr., Bruce C. Aultman, Hattiesburg, Miss., G. William Baab, Dallas, Tex., for Int. Brotherhood of Teamsters.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before MORGAN and FAY, Circuit Judges, and HUNTER,* District Judge.
 LEWIS R. MORGAN, Circuit Judge:
 
 
 1
 Russell Walters, Alton Cavenaugh, J. L. Henson and E. L. Lanterman, individually and as representatives of a class composed of over-the-road-relay drivers, brought the present action against Roadway Express, the International Brotherhood of Teamsters, and Local 891 of that union. The instant dispute involves the following sequence of events. On January 3, 1970, the Interstate Commerce Commission (hereinafter ICC) granted Roadway permanent authority to control West Brothers, Inc. (West), a Mississippi motor carrier in desperate financial condition, and Roadway merged the operation of West into its system. Shortly thereafter, Roadway transferred twenty-nine West drivers from various other terminals to the Roadway terminal in Meridian, Mississippi. In determining the seniority of these transferring employees, Roadway had two options: it could either "dovetail" the employees a term used to refer to a merging of two separate seniority lists upon the transfer of employees of a company from one terminal to another or place the names of the West drivers at the bottom of the existing seniority list at the Meridian terminal. Roadway submitted the question to the Change of Operations Committee, a sub-committee of the Southern States Multi-Conference Committee that is composed equally of union and management officials not affected by the change in question. Following a hearing, that body ruled that the seniority of transferred drivers should be dovetailed with that of those drivers already employed at the Meridian terminal; that is the seniority of the former was to be based on the date of their employment with West, not on the date of their transfer to Meridian. This decision resulted in a reduction of seniority for the plaintiffs, who represent drivers who were working at the Meridian terminal before the transfer of West drivers. Earl Byers, one of these Roadway employees whose seniority was being reduced, filed a grievance that was heard by the Southern States Multi-Conference Committee pursuant to the grievance procedure outlined in the collective bargaining agreement. Art. 7, p. 59. That committee denied the protest.
 
 
 2
 Subsequently, on April 10-12, 1970 several employees allegedly engaged in an unauthorized work stoppage to protest the reduction in their seniority. Roadway discharged eight of them, pursuant to Article 42, Section 2, p. 100-101 of the collective bargaining agreement. These eight filed a grievance with the appropriate committee; the grievance committee reinstated three of the grievants without pay, but upheld the discharges of the other five.
 
 
 3
 On this appeal, plaintiffs raise three issues. First, they contend that the reduction in their seniority violated the order of the ICC granting Roadway control over West's operations. Second, they argue that this reduction violated the National Master Freight Agreement (NMFA), the collective bargaining agreement under which the unions and management were governed. Finally, plaintiffs contend that the committee erred in denying the plaintiffs' grievance over their dismissal for allegedly conducting a wildcat strike.
 
 
 4
 The district court rendered a judgment for defendants as a matter of law on the ICC claim, holding that any complaint relating to an alleged violation of an ICC order was within that agency's exclusive jurisdiction. Accordingly, the district court ruled that it had no jurisdiction over the claim and granted a partial summary judgment for defendants. We disagree with that court's conclusion since 28 U.S.C. § 1336 provides that the district court shall have jurisdiction to enforce, in whole or part, any order of the Interstate Commerce Commission.[1] Here, plaintiffs allege that the committee's action in reducing their seniority violated a condition in the ICC order of merger that no employee be placed in a worse position as a result of the merger and, thus, they seek enforcement of that order as part of their claim for relief. § 1336 is, therefore, a jurisdictional basis for this part of the complaint.[2] See Clemens v. Central R.R. Co. of New Jersey, 264 F.Supp. 551 (E.D.Pa.1967), reversed on another ground, 399 F.2d 825 (3rd Cir. 1968). We offer no opinion as to the plaintiffs' likelihood of success in their litigation of this claim,[3] but merely hold that it should not have been dismissed on jurisdictional grounds.
 
 
 5
 Plaintiffs' second and third contentions, jurisdiction of which is § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1973), relate to the propriety of the committee's decision, made pursuant to the collective bargaining agreement,[4] to reduce their seniority and to discharge five of their members for their alleged participation in a wildcat strike. First, they argue that the joint committee of union and management officials exceeded its authority under the agreement when it allowed the seniority of transferring West drivers to be merged with their own. The United States Supreme Court has held that reviewing courts are to accord the same finality to decisions of committees operating under the National Master Freight Agreement as they do to traditionally neutral arbitrators. Riss & Co. v. General Drivers Local 89, 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963). That courts have a very limited role in reviewing the merits of an arbitrator's decision is a familiar axiom in labor law. Thus, the reviewing court asks only whether the particular grievance is arbitrable under the agreement and whether the arbitrator's award "draws its essence from the (contract)." United Steelworkers v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). Assuming that the court can answer both these questions affirmatively, the court's participation in determining the correctness of the arbitrator's decision is over, for "plenary review by a court of the merits would make meaningless the provision that the arbitrator's decision is final . . . ; it is the arbitrator's (decision that) was bargained for and (as) far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." Id. at 599, 80 S.Ct. at 1362. See also U.S. Steelworkers v. Warrior and Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); Gulf States Telephone Co. v. Local 1692, 416 F.2d 198 (5th Cir. 1969); Brotherhood of RR Trainmen v. Central of Ga. Railway Co., 415 F.2d 403 (5th Cir. 1969); Safeway Stores v. American Bakery & Confectionary Workers Local 111, 390 F.2d 79 (5th Cir. 1968).
 
 
 6
 In this case, plaintiffs have not denied that seniority claims are arbitrable under the collective bargaining agreement, but they do contend that the COC went beyond the scope of the agreement when it reduced plaintiffs seniority. Specifically, plaintiffs point to § 3(a)(1)-(5) and § 5(b)(2).[5] of Article 5 of the NMFA, which sets out guidelines to be used in determining seniority questions, and argue that these provisions required the COC to place West drivers at the bottom of any seniority list. Assuming without deciding that these provisions accurately describe the circumstances under which the West-Roadway merger occurred, we find that plaintiffs have ignored the crucial section of Article 5 § 7 which states:
 
 
 7
 The parties acknowledge that specific situations may arise which may not be covered by the rules set forth in this Article or in which the parties may feel that different treatment of the problem is necessary. In such situation, the Employer, the Unions involved, and the Area Multi-Conference or National Committees may mutually agree to such disposition of the seniority problems as in their judgment is appropriate under the circumstances. The Change of Operations Committee under the Local Supplements or the National Master Agreement shall have the authority to add to or to modify these rules in specific situations presented to them. (Emphasis added.)
 
 
 8
 Thus, § 7 makes it clear that § 3 and § 5 are merely guidelines that the parties can decline to employ when they feel that such use is inappropriate. Indeed, the Third Circuit encountered a situation almost identical to the present case and held that § 7 permitted the joint committee to fashion appropriate seniority allocations:
 
 
 9
 But Section 7 leaves flexibility to deal with unforeseen situations, permitting the parties to the contract to bargain further on an ad hoc basis whenever a closing occurs. The parties reserved the right to have the employer, the unions involved and specially designated committees 'mutually agree' at some future time to a disposition of the seniority problems as they may determine in their best judgment. Section 5(b)(2) was the rule but in specific situations Section 7 retained the right of the aforementioned parties to find other flexible solutions. They thereby retained their freedom to continue their contract making during the term of the pact. Thus, seniority rights of individual employees under the contract in the event of a closing of a terminal, were subject to further negotiations and agreement under Section 7.
 
 
 10
 The actions of the membership and the past history of the contract supports this rationale. While it seems that all local officials to whom transferees from Bedford spoke expected Section 5(b)(2) to be adhered to, it is equally clear that the matter was not settled. There was a considerable amount of discussion at each committee meeting about whether the men should be dovetailed or put at the bottom of the seniority list at their new terminal. There is nothing in the record that would lead to the conclusion that such discussions were out of the ordinary, or that the expectation of anyone involved in the proceedings was that the matter was totally concluded by automatic application of Section 5(b)(2).
 
 
 11
 Price v. International Brotherhood of Teamsters, 457 F.2d 605, 611 (3rd Cir. 1972). See also Bieski v. Eastern Automobile Forwarding Co., 396 F.2d 32 (3rd Cir. 1968); McDermott v. Teamsters Joint Council No. 53, 347 F.Supp. 473 (E.D.Pa.1972); Albert v. Chemical Leaman Tank Lines, 344 F.Supp. 1141 (S.D.W.Va.1972).
 
 
 12
 Having determined that the joint committee acted within the confines of the NMFA in reducing plaintiffs' seniority, however, does not end the inquiry. Thus, if plaintiffs can demonstrate that they were not awarded fair representation by their union in pursuing their claims on seniority, the decision of the joint committee is not deemed final. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). The well-settled guideline for determining whether the union did not fairly represent its members' claims was articulated by the Supreme Court in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). In that case, the Court held that a union has an obligation to "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." 380 U.S. at 177, 87 S.Ct. at 910, 17 L.Ed.2d 850. In this case, the district court found that the local union had satisfied this "good faith" test and plaintiffs have not demonstrated to us that this finding is clearly erroneous under F.R.Civ.P. 52(a).
 
 
 13
 Finally, plaintiffs challenge the joint committee's finding that five of their number were properly discharged for engaging in a wildcat strike. Yet, Roadway contends that Article 42, § 2 authorized the discharges and that the Multi-State Grievance Committee resolved the grievances filed by the five employees in its favor. We agree with the district court's finding that the local union[6] fairly represented the discharged employees in their hearing on the grievance, pursuant to Vaca, and, therefore, no arbitrary or bad faith conduct existing on the part of the union, we do not inquire into the reasoning of the grievance committee the body designated contractually by the parties to make a final decision in such matters.[7]
 
 
 14
 Finally, appellee Roadway argues that the trial court abused its discretion in requiring it, the prevailing party, to bear its own costs. Rule 54(d) of the Federal Rules of Civil Procedure provides that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." The trial court has broad discretionary powers in taxing costs, but its decision may be overturned if it abuses that discretion. Harrington v. Texaco, Inc., 339 F.2d 814 (5th Cir. 1964), cert. denied, 381 U.S. 915, 85 S.Ct. 1538, 14 L.Ed.2d 435. While the rule does not prevent a trial court from requiring a prevailing party to bear its own costs, "the language of the rule reasonably bears the intendment that the prevailing party is prima facie entitled to costs and it is incumbent on the losing party to overcome that presumption . . . (since) denial of costs . . . is in the nature of a penalty for some defection on his part in the course of the litigation." Popeil Brothers v. Schick Electric, Inc., 516 F.2d 772, at 775 (7th Cir. 1975). Accordingly, when a trial court exacts such a penalty, it should state reasons for its decision. Id. Accord, Pelineon de Navegacion v. Texas Petroleum Co.,540 F.2d 53 (2 Cir. 1976); Samuel v. University of Pittsburg, 538 F.2d 991 (3rd Cir. 1976); ADM Corp. v. Speedmaster Packaging Corp., 525 F.2d 662 (3rd Cir. 1975). Here, the trial court gave no reasons for its decision to deny the prevailing parties their cost. Accordingly, we remand the question of costs to the district court for it to state a justification for its denial of costs to appellees, so that we may have some basis upon which to judge whether it acted within the proper confines of its discretion.[8]
 
 
 15
 In summary, we remand the matter of costs and that part of the complaint seeking enforcement of the ICC order to the district court and affirm its approval of the committees' decisions on seniority and the discharges of five employees.
 
 
 16
 Affirmed in part, reversed in part.
 
 
 
 *
 Senior District Judge of the Western District of Louisiana sitting by designation
 
 
 [1]
 28 U.S.C. § 1336(a) states:
 Except as otherwise provided by Act of Congress, the district courts shall have jurisdiction of any civil action to enforce, in whole or in part, any order of the Interstate Commerce Commission, and to enjoin or suspend, in whole or in part, any order of the Interstate Commerce Commission for the payment of money or the collection of fines, penalties, and forfeitures.
 
 
 [2]
 We base jurisdiction only on 28 U.S.C. § 1336 and reject plaintiffs' contention that 49 U.S.C. § 5 provides an independent source of authority in its requirement that the ICC as a condition of its approval of a merger, require a "fair and equitable arrangement to protect the interests of the railroad employees affected" and insure that "such transaction will not result in employees . . . affected by such order being in a worse position with respect to their employment." 49 U.S.C. § 5(2)(f). By its terms, however, 49 U.S.C. § 5(2)(f), clearly applies only to employees of railroads, not motor carriers, involved in a merger. Therefore, the statute does not require the ICC to grant these protections to employees of motor carriers
 
 
 [3]
 Indeed, while plaintiffs indicate in their brief (Appellant's Brief, p. 42) that the ICC order required the carrier to insure a fair and equitable arrangement to protect the interests of the employees affected by Roadway's acquisition of West, our examination of the record indicates only that the hearing examiner stated in his recommendation of the merger to the ICC that given the high turnover among motor transportation employees, "it is unlikely that the interests of employees will be materially adversely affected by the transaction." R., 296. Whether this statement was embodied in the order and whether it means that the parties must insure that no adverse effect on employees occurs is a matter for the district court to decide on remand. Assuming that such a requirement is part of the order, the district court will also have to determine whether a reduction in the seniority of Roadway employees at the Meridian terminal was the "material adverse effect" envisioned by the hearing examiner
 
 
 [4]
 The collective bargaining agreement that covers the activities in question was the National Master Freight Agreement for the period of April 1, 1967 March 31, 1971
 
 
 [5]
 Article 5 provides in pertinent part:
 
 
 [3]
 (a) In the event that the Employer absorbs the business of another private, contract or common carrier, or is a party to a merger of lines, the seniority of the employees absorbed or affected thereby shall be determined by mutual agreement between the Employer and the Unions involved
 In the application of this provision the following general rules shall apply:
 Merger, purchase, acquisition, sale, etc.
 (1) If both carriers involved are solvent then the seniority lists of the two Companies should be dovetailed so as to create a Master Seniority List based upon total years of service with either Company. This is known as dovetailing in accordance with years of seniority.
 In the application of this rule it is immaterial whether the transaction is called a merger, purchase, acquisition, sale, etc. It is also immaterial whether the transaction involves merely the purchase of stock of one corporation by another, with two separate corporations continuing in existence, and it is immaterial whether separate terminals of the Companies are physically merged or not, subject, however, to rules 4 and 5 below.
 (2) If, in the type of transaction described above, one of the Companies is insolvent at the time of the transaction, then the employees of the insolvent Company will go to the bottom of the Master Seniority List. The test of whether a Company is solvent or insolvent is governed entirely by whether bankruptcy, receivership, composition for the benefit of creditors, reorganization, or similar proceedings are pending in the state of (sic) federal court. If such proceedings are pending, the Company is considered insolvent for the purpose of this rule.
 (3) If the transaction involved constitutes merely a purchase of permits or rights by one Carrier from another Carrier, without the purchase or acquisition of equipment, terminals, or business, the employees of the Company selling the permits shall have no seniority rights at all, but shall be offered opportunity for employment at the bottom of the seniority list of the Company purchasing the permits. If such employees are hired they shall be given seniority credit for fringe benefits only.
 (4) If the merger, purchase, acquisition, sale, etc. involves two Companies which do not have parallel operating rights then separate seniority lists will be maintained for the separate non-parallel operations. However, there will be one master seniority list for the purpose of fringe benefits, etc., and for the protection of employees laid off on one seniority board when work opportunities are available on the other seniority board and all eligible employees on such other seniority board are employed.
 (5) Where the transaction involves both parallel and non-parallel rights then rules 1 and 2 above will apply to the parallel rights, and rule 4 will apply to non-parallel rights.
 
 
 [5]
 (b)(2) When a branch, terminal, division or operation is closed or partially closed and the work of the branch, terminal, division or operation is transferred to another branch, terminal, division or operation in whole or in part, an employee at the closed or partially closed down branch, terminal, division or operation shall have the right to transfer to the branch, terminal, division or operation into which the work was transferred if regular work is there available. Such employee, however, shall go to the bottom of the seniority board and shall have the right of job selection only in accordance with his seniority at such terminal. However, he shall exercise his company seniority for lay-off purposes and all other contract benefits
 
 
 [6]
 Plaintiffs have not demonstrated to be clearly erroneous the district court's finding that Teamsters International was not its bargaining agent and that it, therefore, unlike the local chapter, did not have a duty to pursue their grievance before the committee. See Fed.R.Civ.P. 52(a)
 
 
 [7]
 The district court inquired into the correctness of the Multi-State Grievance Committee's decision, and found that plaintiffs had engaged in an unauthorized strike for which they could be discharged pursuant to Art. 42, § 2
 
 
 [8]
 Roadway also argues that the district court abused its discretion in denying its untimely motion to file a counterclaim against plaintiffs. Roadway has not demonstrated to this court an abuse of discretion and we sustain the district court's action